### DANIEL v. TOLON *et al.*

No. 6361.   Opinion Filed April 11, 1916.

Rehearing Denied May 23, 1916.

(157 Pac. 756.)

1.   **PARENT AND CHILD—Stepchild—Liability for Support.** A husband, who receives into his family and supports his wife's child by a former marriage, will be presumed to have done so as a parent; and where such is the case, said child is not liable to him for its support.   Section 4378, Rev. Laws 1910.

2.   **GUARDIAN AND WARD—Dealings Between—Presumption of Fraud.** Courts watch with great jealousy transactions of guardians with their wards, or any dealings between them affecting the estate of the ward.   From the confidential relations between them, it will be presumed that the ward was acting under the influence of the guardian, and all transactions between them prejudicially affecting the   interests of the ward will be held to be constructively fraudulent.   This presumption extends to transactions between them after the guardianship has ended, but where the influence remains, and the control and dominion over the former ward's property still continues.

3.   **SAME—Proof to   Overcome Presumption.** The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest sense suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained.   The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continues.   This influence is presumed to last while the guardian's

functions are to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. Any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit at the expense of the former ward made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption.

4. SAME—Conveyance by Former Ward—Validity. A deed by an illiterate Creek freedwoman, of the major part of her allotment, made one week after the discharge of her legal guardian, to her stepfather and former guardian, with whom she at the time resided, and who was at the time her attorney in fact and in control of her allotted lands, in consideration of her support by said grantee during her minority, it not appearing that she was advised of her legal rights, is constructively fraudulent. In such circumstances, to bind the grantor, it must appear that she acted after the termination of her legal disability, with deliberation and with full knowledge of all the material facts respecting her right.

5. NOTICE—Attesting Witness—Contents of Instrument. One who signs an instrument as an attesting witness to the signature of the maker is not thereby, and from that fact alone, charged with knowledge of the contents of the document signed by him.

6. VENDOR AND PURCHASER—Notice—Records. A purchaser of lands, who buys in reliance upon the record title, is chargeable with all the notice brought to him by the records; and if the record contains matters that would put a person of ordinary prudence upon inquiry into the nature of the title of the grantor, or of the rights and equities of a former owner, then the law charges such purchaser with all the knowledge an inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him.

7. SAME—"Actual Notice." Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself. Section 2926, Rev. Laws 1910.

(Syllabus by the Court.)

*Error from District Court, Creek County;*
*Wade S. Stanfield, Judge.*

Action by Eliza Daniel against Clinton Tolon and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded, with directions.

*George James,* for plaintiff in error.

*McDougal & Lytle* and *Charles A. Dickson,* for defendant in error Charles A. Dickson.

*C. W. Holbrook,* for defendants in error Clinton Tolon, J. W. Teter, and N. T. Gilbert.

SHARP, J. On the application of Clinton Tolon, the county court of Okmulgee county, on October 15, 1910, appointed said Tolon guardian of the persons and estates of his stepchildren, Eliza West, Kizzie West, and George West, minors. Said minors were at the time of Tolon's appointment, according to the recitals of his petition, aged, respectively, 15, 13, and 10 years, and were freedmen citizens of the Creek Nation, each possessed of an allotment of land. Eliza, whose estate alone is involved in the present action, according to the evidence, arrived at the age of 18 years on or about the 20th day of November, 1911. On February 6, 1912, said guardian made his final report, showing an indebtedness due him from the estate of his ward in the sum of $154.95, and at the same time filed in the county court a final receipt of said ward, signed and marked, and on the same day said court made and entered an order approving the final report, and discharged said Tolon as guardian of Eliza. On February 5th, or the day prior to the foregoing transactions, said Eliza executed a power of attorney to said Tolon, authorizing him to lease the south one-half of the north one-half of section 13, township 15 north, range 8 east, for agricultural purposes, and to collect and receipt for all rentals or income arising therefrom, and also to make and ex-

ecute an oil lease on said land. Said power of attorney was filed for record in the office of the register of deeds on March 1, 1912. On February 13, 1912, Eliza gave a warranty deed to 120 acres of her land to said Tolon, for a consideration, as shown by the deed, of $1,500. Said deed was placed of record on the same day and at the same hour as the power of attorney previously executed. On May 17th thereafter said Tolon, in his own right and as attorney in fact for Eliza, executed to J. W. Teter and N. T. Gilbert a three-year agricultural lease on the 120 acres of land included in Tolon's deed, the term of which lease was to begin January 1, 1913, the consideration therefor being $175; and in addition to which the lessees agreed to put in cultivation as much as 15 acres of new land, and to make certain repairs on the premises. The lease purports to be the joint lease of said Tolon and Eliza, and was filed for record on May 18th following its execution. On February 13, 1912, and on the same day that Eliza gave her deed to Tolon, she executed to A. D. Kennedy a mortgage on 120 acres of her land for the purported consideration of $500, which mortgage was filed for record on the day following its execution. On June 19, 1912, Clinton Tolon, joined by his wife, Lucy, executed a deed to the lands described in the deed from Eliza to Tolon, to Charles A. Dickson for the consideration of $200, which deed was shortly thereafter placed of record. Eliza lived with her mother and stepfather until April, 1911, when her mother, Nancy, died. Thereafter she continued to live with Tolon until November, 1912, when she married one Daniel. While she had attended school for a short time, the evidence is convincing that she was illiterate, uneducated, and inexperienced in busi-

ness affairs. The several instruments executed by her were each signed by mark.

Plaintiff's action is for a cancellation of her purported deed to Tolon, the deed of Tolon to Dickson, and the lease made by Tolon to Teter and Gilbert, on the ground, as stated by counsel:

"By her petition herein plaintiff in error admits the execution by her of one deed on the property in controversy, and asks that the same be canceled on account of there being no consideration, or no sufficient consideration therefor, under the existing fiduciary relations existing between the plaintiff in error and defendant Clinton Tolon, and that it be canceled for the further reason that it was secured by false representations as to its character, and is therefore a forgery and void under section 2646, Rev. Laws 1910."

While there is some conflict in the testimony, particularly as to the belief of Eliza as to the character of instrument that she was called upon to execute on February 6, 1912 (believing it, as she contends, to be an oil lease), the material facts respecting the fiduciary relations and the consideration for the deed are undisputed. As to the consideration, the testimony of Tolon is that the deed was taken in settlement of an account owing him by Eliza for board for some eight years prior to the time he was appointed guardian, and that as she did not get sufficient out of the mortgage to Kennedy to pay him, it was agreed that she would deed him the land subject to the mortgage, which he was to take care of. Being asked on cross-examination concerning the transaction, the following testimony was adduced:

"Q. How much did she owe you for keeping her and taking care of her? A. Well, we did not have any arrangement over it; we thought probably it was about

$500 or $600, somewhere along there; about $75 per year. Q. She lived there with you and her mother all of this time? A. Yes, sir. Q. You were living on and receiving the profits from her mother's allotment? A. Yes, sir. Q. You sold 120 acres of her mother's allotment, her surplus, and spent that during that time, didn't you? A. Yes, sir; I did. Q. That money, which was derived from the sale of her mother's surplus allotment was used by her mother and by you in buying clothing for this girl and keeping her, was it not? A. A portion of it was. Q. Her mother was satisfied and wanted that done, did she? A. She didn't say anything about it. Q. You finally sold all your interest in Eliza's mother's land, and spent it all, didn't you? A. Yes, sir; here last fall I did. Q. Are you a married man now? A. Yes, sir. Q. Who is your last wife? What is her name? A. Lucy West. Q. What relation is she to this girl? A. First cousin. Q. How old was she when you married her? A. A little over sixteen. Q. Did she have an allotment of land? A. Yes, sir. Q. This is all you ever paid for this land, just for her board and keeping her, is it? A. Yes, sir; I was to have the deed for my settlement. Q. What race of people do you belong to? A. Colored."

On account of the $500 mortgage, it seems that either Eliza or her stepfather received, after deducting commissions, taxes, abstract fees, inspection fees, and other charges, $376.44. Eliza's testimony is that she did not receive any portion of this money, but that her stepfather, guardian, and attorney in fact got it. This Tolon denies, and says that the money was paid to Eliza. The testimony of the loan agent showed that the 120 acres of land in controversy was reasonably worth from $1,400 to $1,500. There is testimony tending to show that Eliza, while living with her stepfather, worked about the house and in the fields.

Section 4378, Rev. Laws 1910, provides that:

"A husband is not bound to maintain his wife's children by a former husband; but if he receives them into his family and supports them, it is presumed that he does so as a parent, and where such is the case, they are not liable to him for their support, nor he to them for their services."

In *Barker v. Barker*, 25 Okla. 48, 105 Pac. 347, 26 L. R. A. (N. S.) 909, we held that a stepfather is neither entitled to the custody nor the earnings of the children of his wife by a former husband, and that there is no reciprocal obligation to maintain them; but, where he does admit them into his family and assumes the relationship of parent, the reciprocal rights, obligations, and duties of parent and child attach, and continue as long as that relationship exists.

While equity does not deny the possibility of valid transactions between parties, where a fiduciary relationship exists, yet because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively his compliance with equitable requisites, and of thereby overcoming the presumption. The broad principle on which the court acts in cases of this description is that wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a con-

tract with the person so trusting him. Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influences exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed. *Tate v. Williamson,* L. R. 1 Eq. 536; *Tate v. Williamson,* L. R. 2 Ch. 55, 60; *Rhodes v. Bate,* L. R. 1 Ch. 252, 257. The principle announced and its effect upon the rights and liabilities of the parties thereto extends to transactions between a trustee and a beneficiary, principal and agent, attorney and client, guardian and ward, parent and child, as well as to other relations. Of transactions between a guardian and his ward, it is said in Pomeroy's Equity Jurisprudence, sec. 961:

"The equitable rules concerning dealings between guardian and ward are very stringent. The relation is so intimate, the dependence so complete, the influence so great, that any transactions between the two parties, or by the guardian alone, through which the guardian obtains a benefit, entered into while the relation exists, are in the highest sense suspicious; the presumption against them is so strong that it is hardly possible for them to be sustained. * * * The general doctrine of equity applies to the parties after the legal condition of guardianship has ended, and as long as the dependence on one side and influence on the other presumptively or in fact continues. This influence is presumed to last while the guardian's functions are to any extent still performed, while the property is still at all under his control, and until the accounts have been finally settled. It follows, therefore, that

any conveyance, purchase, sale, contract, and especially gift, by which the guardian derives a benefit, made after the termination of the legal relation, but while the influence lasts, is presumed to be invalid and voidable. The burden rests heavily upon the guardian to prove all the circumstances of knowledge, free consent, good faith, absence of influence, which alone can overcome the presumption."

In the following section, speaking to the relationship between parent and child, the author says:

"The transaction may be one of bounty from the child to the parent, soon after the child has attained twenty-one. In such cases the court views the transaction with jealousy, and anxiously interposes its protection to guard the child from the exercise of parental influence. The law on this subject is well settled. A child makes a gift to a parent, and such gift is good if it is not attended by parental influence. A child is presumed to be under the exercise of parental influence as long as the dominion of the parent lasts. Whilst that dominion lasts it lies on the parent maintaining the gift, to disprove the exercise of parental influence, by showing that the child had independent advice, or in some other way. When the parental influence is disproved, or that influence has ceased, a gift from the child stands on the same footing as any other gift, and the question to be determined is, whether there was a deliberate, unbiased intention on the part of the child to give to the parent."

We mention the relation of guardian and ward and of parent and child together, for the reason that here both existed; indeed, more than that, the relation of principal and agent had also attached.

The same rule is announced in Story's Equity Jurisprudence, sec. 317, where it is said, referring to the relation of guardian and ward:

"In this most important and delicate of trusts the same principle prevails, and with a larger and more comprehensive efficiency. It is obvious that during the existence of the guardianship the transactions of the guardian cannot be binding upon the ward if they are of any disadvantage to him; and indeed the relative situation of the parties imposed a general inability to deal with each other. But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardians and wards to stand, even when they have occurred after the minority has ceased and the relation become thereby actually ended, if the intermediate period be short, unless the circumstances demonstrate, in the highest sense of the term, the fullest deliberation on the part of the ward, and the most abundant good faith (*uberimma fides*) on the part of the guardian. However in all such cases the relation is still considered as having an undue influence upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased, as if the accounts between the parties have not been fully settled, or if the estate still remains in some sort under the control of the guardian."

As said by Lord Hardwick, in *Hylton v. Hylton,* 2 Ves. Sr. 548:

"Where a man acts as guardian or trustee in nature of a guardian for an infant, the court is extremely watchful to prevent that person's taking any advantage immediately upon his ward's coming of age, and at the time of settling accounts or delivering up the trust, because an undue advantage may be taken. It would give an opportunity, either by flattery or force, by good usage unfairly meant, or by bad usage imposed, to take such an advantage."

In even more emphatic language, Lord Eldon expressed himself in *Hatch v. Hatch,* 9 Ves. 297. By Lord Chancellor Manners, in the High Court of Chancery in

Ireland, it was said in *Dawson v. Massey*, 1 Ball & Beatty, 219, 232:

"Generally speaking, there are no transactions in a man's life that ought in this court to be more scrupulously or with more jealousy, examined, than those which occur recently after he attains the age of twenty-one, affecting his real property; antecedent to that time his infancy is his protection, his disabilities are his security; but instantly after he attains the age of twenty-one, as if he had accrued all the prudence and experience necessary to the management or disposal of his property, with the possession are given the absolute control and dominion over his estate. At law all his acts are binding, all his deeds are valid, unless upon some distinct case of fraud, they can be impeached; but it is not so in this court; those relations of guardian and ward, principal and agent, trustee and *cestui que* trust, which are little regarded in a court of law, are in this court decisive against the validity of a transaction, which between strangers could not be impeached."

To the same effect are the decisions of the courts of this country, to a few of which we call attention. In *McParland v. Larkin*, 155 Ill. 84, 39 N. E. 609, a deed was made by a female ward, practically without knowledge or experience in business affairs, a few days after attaining her majority, and before her guardian had made his final report, to the guardian's wife, who was her elder sister, and with whom she was living, and it was said, quoting from Schouler on Dom. Rel., sec. 389:

"But such transactions are always to be regarded with suspicion; and where the influence still continues, as, if the ward be a female or a person of weak understanding, and the guardian continues to control the property or to furnish a home, the court is strongly disposed to set aside the bargain altogether."

In that case the peculiar interests of the guardian were opposed to that of the ward. His wife then owned the other two-thirds of the realty in question, and by the deed was acquiring the one-third belonging to the ward. The latter was induced to execute the deed prepared by her guardian for her signature, for an inadequate consideration, greatly less than the real value of her interest, unless there was taken into consideration her prior support and maintenance in her sister's family. Note the language of the court:

"It is not necessary, in such cases, that actual and intentional fraud be established. It is sufficient, when the parties sustain the relation of guardian and ward, that the former has gained some advantage by the transaction with his ward; to throw the burden of proving good faith and absence of influence, and of knowledge and free consent of the ward, upon the guardian."

In *Gillett v. Wiley*, 126 Ill. 310, 19 N. E. 287, 9 Am. St. Rep. 587, where the guardian procured his ward, after the latter (a young man) had attained his majority, to sign a receipt in full of all money which came into his hands as guardian, the ward not reading the paper or acquainting himself with its contents, but relying solely on the statement of his guardian as to its character and import, it was held that the transaction was void, and even as against the surety upon such guardian's bond, who had taken a mortgage on the latter's land as indemnity against loss as surety. It was said:

"Ordinarily, one having the means of information as to the contents of a paper executed by him will * ¯ * * be held to have known the contents, and will not be permitted to assert his ignorance of its contents to avoid responsibility according to its real import. Here, however, the signing of this receipt was the act and will of the

guardian, rather than that of appellee. Courts will watch settlements of guardians with their wards, or any act or transaction between them affecting the estate of the ward, with great jealousy. From the confidential relation between the parties, it will be presumed that the ward was acting under the influence of the guardian, and all transactions between them, prejudicially affecting the interests of the ward, will be held to be constructively fraudulent."

Transactions between guardian and ward are learnedly discussed in *Garvin's Adm'r v. Williams,* 44 Mo. 465, 100 Am. Dec. 314; *Id.,* 50 Mo. 206, where, in the latter opinion, it is said:

"When a ward has but recently arrived at age, any acts of his conferring an advantage or bounty upon his late guardian excite the strongest suspicions, and are viewed by the courts with an almost invincible jealousy. They are considered as constructively fraudulent on account of the confidential relations existing between the parties. They are withdrawn from the operation of the ordinary rules of evidence, and the burden is devolved on the beneficiary of showing that the gift * * * was fair and conscientious and beyond the reach of suspicion. A rule of public policy and pure morals lies at the foundation of this principle and demands its stringent enforcement. Any one occupying a fiduciary relation so recently that the influence is presumed to still exist cannot avail himself of a bounty from his late ward, or other person holding the relation, unless there is clear and distinct evidence that the influence has determined, and that the donor acted in a manner perfectly free, independent and unbiased. And the beneficiary must in all instances furnish this evidence. That it is not easily attainable I am aware, and therefore learned judges have said that it is almost impossible to make this proof."

In *Williams v. Davidson's Estate,* 133 Mich. 344, 94 N. W. 1048, it is said:

"The rule is elementary that, even after the ward attains majority and the guardian's accounts have been settled, while the disability of infancy has been removed, that arising from the trust relation is but slightly diminished, and contracts between the guardian and ward are scrutinized with the utmost care and caution, and, if the guardian derives a benefit or the ward suffers a loss by the transaction, it will not be sustained if the court is convinced that there is lacking the element of the utmost fairness and good faith."

A number of English authorities are reviewed in *Berkmeyer v. Kellerman*, 32 Ohio St. 239, 30 Am. Rep. 577, where it was held that a conveyance by a minor, on the date he came of age, of all his real estate to a person occupying the relations of parent and guardian of such minor, in execution of a settlement made for such minor by others not authorized to bind him, and while he was still under his influence and control, and not advised of his rights, was not binding, and could only be upheld in a court of equity by clear proof that under all the circumstances it was just and equitable, and that the burden was on the claimant to show the utmost good faith.

Section 2034 of the Kentucky Statutes of 1903 provides that no disbursements should be allowed the guardian for the maintenance and education of the ward beyond the income of the estate, except in the following cases, unless authorized by the deed or will under which the estate is derived: (1) When the ward is of such tender years or infirm health that he cannot be bound out as an apprentice, or no suitable person will take him as such; (2) when it is best for the ward that the principal of his personal estate shall be applied for his board and tuition, and the court, upon the settlement of his accounts, shall deem such application to have been judi-

cious and properly made. But neither the ward nor any of his real estate shall be liable for any such disbursements. In giving consideration and effect to this statute, it was said in *Fidelity Trust Co. v. Butler*, 28 Ky. Law Rep. 1268, 91 S. W. 676:

"Where, after arriving at his majority, a ward executed a mortgage on his real estate to reimburse his guardian for moneys expended by the latter during the guardianship in excess of the income of the estate, though for the benefit of the ward, the execution of such mortgage did not constitute a ratification of the expenditures by the guardian, it appearing that the ward acted entirely on his guardian's advice in making the mortgage, and without any knowledge of his rights under the express provisions of the statute exempting his real estate from liability for such expenditures."

Here, confessedly, no valid consideration was received by the former ward for her land. Under the statute, having been accepted into her stepfather's family as a member thereof, Eliza was not liable to him for her support. See rule 14 of this court (47 Okla. xvi), governing the procedure in probate matters in the county courts and other courts of the state. Aside from this, or rather in addition thereto, so far as disclosed by the record, Tolon while guardian made no claim whatever on account of the care and support of his stepchild, and we are irresistibly forced to the conclusion that the claim afterwards made was a mere pretext on the part of Tolon, in an effort to support his title. But whether so or not, it affords no consideration for the deed. Other authorities discussing the subject of contracts between parties standing in a fiduciary relation are *Gidney v. Chappell*, 26 Okla. 737, 110 Pac. 1100; *Burton v. Compton*, 50 Okla. 365, 150 Pac. 1080;

*Malone v. Kelley*, 54 Ala. 532; *Eberts v. Eberts*, 55 Pa. 110; *Willey et al. v. Tindal*, 5 Del. Ch. 194; *Waldstein v. Barnett*, 112 Ark. 141, 165 S. W. 459; *Wright v. Arnold,* 14 B. Mon. 638, 61 Am. Dec. 172; *Sullivan v. Blackwell*, 28 Miss. 737.

That the influence arising from the relationship of the parties had not terminated, but on the other hand continued, is abundantly established. Eliza continued to live with her guardian after attaining her majority, and after his discharge as guardian; on the very day preceding the making of his final report, Tolon took from his ward a power of attorney, thereby continuing his control of her property, or at least of that involved in the case at bar; and thereafter acted under said authority. In the making of the mortgage to Kennedy, as in all other transactions, Tolon was the controlling, the dominating, force. That Eliza had other or independent advice in her affairs does not appear. That she was informed that her stepfather legally had no claim upon her for her board, and hence that she owed him nothing, is not established, and the fair inference is that she was led to believe she was liable to him on such account, and for that reason gave the deed; assuming, as claimed by Tolon, that she knew the real nature of the instrument signed by her. The transaction, viewed from the standpoint of the defendant Tolon, is nothing more or less than a gift from a ward, but recently arrived at age, to a former guardian, made shortly following the guardian's discharge, for we have seen there was no consideration sufficient in law to support the deed. In addition to the late relationship, a new one, i. e., that of principal and agent, had in effect been substituted, and during all of said times the domestic relation of stepfather and step-

child, with its reciprocal statutory duties and liabilities, continued.

To permit the deed from Eliza to Tolon to stand, unless the rights of innocent purchasers intervened, would be a reproach to a court of equity, charged with a high sense of responsibility to an illiterate and uneducated child, under, at the time, as we think the evidence shows, the complete dominion and control of her stepfather. Few cases could present greater equities, considered apart even from the question of actual fraud. We confess an aversion toward the conduct exhibited by the guardian in this case. Instead of acting as her protector, the guardian, by virtue of his many relations, availed himself of his position to rob of her possessions an illiterate orphan, his ward and stepchild, to whom he stood *in loco parentis*. Insensible of its duty must be the court that would permit such transaction to stand, unless by reason of the rights of third persons, innocently obtained. To the ignorant, unlettered orphan children of this state, of whatever race, courts of equity offer an asylum of refuge against such despoilers.

What, then, is the position of Charles A. Dickson, Tolon's vendee? In his answer he says that he purchased the lands in good faith for a valuable consideration, without notice of any right or claim on the part of the plaintiff. From the evidence we find that on February 5, 1912, Eliza executed to her stepfather, and then legal guardian, a power of attorney to lease 160 acres of her land for agricultural and other purposes, and to erect improvements thereon—in short, to do everything requisite and necessary to be done in the premises, as fully as she could do in person. On the 13th day of February following, by warranty deed Eliza conveyed to

Tolon 120 acres of her land, subject to a certain mortgage of even date therewith to A. D. Kennedy for $500. Both this deed and the power of attorney were filed for record in the office of the register of deeds at 9 o'clock a. m., March 1, 1912; the Kennedy mortgage on February 14th of said year. On May 17, 1912, Tolon, both in his own right, and as attorney in fact for Eliza, made to Teter and Gilbert a three-year lease on said 120 acres of land, beginning January 1, 1913. This lease is in part as follows:

"This agreement made and entered into this 17th day of May, 1912, by and between Clinton Tolon for himself and Eliza West, by Clinton Tolon, attorney of Beggs, Oklahoma, parties of the first part, and J. W. Teter and N. T. Gilbert, of Bristow, Oklahoma, parties of the second part, witnesseth, that in consideration of the covenants and agreements thereinafter made, the parties of the first part have let, leased and demised, and do by these presents, let, lease and demise. * * * The said parties of the second part, for the use of said land, agree to pay to the parties of the first part as rent ($175.00) one hundred and seventy-five and no-100 dollars during the term on this contract, payable as follows: All paid upon the execution of this contract, receipt of which is hereby acknowledged. The second parties agree to put in cultivation, in addition to the land now in cultivation on said place, as much as fifteen acres of land. * * * The parties of the first part agree that during the term of this contract to put, keep, and protect the said second parties, their heirs or assigns, in quiet and peaceable possession of the above described land.

"[Signed by first parties]

"CLINTON TOLON,

"ELIZA WEST.

"By CLINTON TOLON, *Attorney.*"

The notary's certificate attached thereto recites that Tolon appeared personally before the notary, and for himself and as attorney for Eliza West, acknowledged his execution of said lease as his free and voluntary act and deed for the use and purposes therein set forth. The lease, we have seen, was recorded on the day following its execution. Of it Dickson had actual as well as constructive notice. By these records Dickson was charged with notice that Tolon obtained his title, if any, to the lands in question from Eliza, and that at the time Eliza executed her deed of conveyance Tolon was her agent or attorney in fact. Dickson was also charged with knowledge of the contents of the lease of May 17th, purporting to be the joint act of Tolon and Eliza; the latter acting through her attorney in fact. This lease follows strictly the grant of authority contained in the power of attorney, and obviously was made pursuant to it. Section 2923, Rev. Laws 1910, provides that notice is either actual or constructive; section 2924, that actual notice consists in express information of a fact; while section 2925 provides that constructive notice is notice imputed by the law to a person not having actual notice. By section 2926 it is further provided that every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself. It is a general rule, independent of statute, that where such facts or circumstances are known to a person in relation to a matter in which he is interested as are sufficient to make it his duty as an honest and prudent man to inquire concerning the rights of other persons in the same matter, and the course of inquiry thus suggested would,

if followed with due diligence, lead to a discovery of rights in conflict with his own, he will be held chargeable with notice of all that he might thus have discovered, and will not be heard to say that he did not actually know of the fact or claim in question. In such cases means of knowledge, with a duty of using them, are deemed equivalent to knowledge itself, and passive good faith will not serve to excuse willful ignorance. 21 Enc. Law, 584. The methods by which notice of prior equities or unrecorded conveyances may be given, so as to affect subsequent purchasers, are as various as the means by which knowledge or information of any fact may be communicated, or by which persons may be led to believe in the existence of such facts.

Looking to the situation of the parties, we find that Mr. Dickson officed with C. W. Holbrook, attorney for Tolon in the guardianship proceedings; that Holbrook had informed him some time prior to his purchase that Tolon was "hard up" and wanted to sell the 120 acres of land covered by the Kennedy mortgage; that Tolon had been in their office on a number of occasions, but that Dickson had had no prior dealings with him; that at one time Dickson told Holbrook "that if there was any little flyer come along, I would take it"; and that thereafter Holbrook mentioned Tolon's name, and told him that he could get the land cheap, and furnished him with information in regard to its value. Dickson does not claim to have ever seen the land, nor does it appear that he made any examination of the title, except to request Holbrook to ascertain in respect to transactions of record since the date of a certain abstract. To the final receipt of Eliza to her guardian, dated January 30, 1912, filed in the county court February 6th thereafter, Dickson was

a witness, having signed his name to Eliza's signature by mark in two places thereon. While the acknowledgment of the notary recites that this receipt was read over to Eliza, it is not shown that this was done in the presence or hearing of Dickson, and from his testimony it appears that he had no knowledge of the contents of said receipt or release. While there are a few authorities to the contrary, the decisions generally are to the effect that a person who signs an instrument as an attesting witness is not charged as a matter of law with knowledge of the contents of the document signed by him, but that in order to charge him with notice, it must appear that he knew what the instrument contained. *Welford v. Beezely,* 1 Ves. 7; *Beckett v. Cordley,* 1 Bros. C. C. 353; *Harding v. Crethorn,* 1 Esp. 57; *Lapenta v. Lettieri,* 72 Conn. 377, 44 Atl. 730, 77 Am. St. Rep. 315; *Vest v. Michie,* 31 Grat. (Va.) 149, 31 Am. Rep. 722. Whether Holbrook was agent for Dickson, and whether Dickson, though not chargeable with notice of the contents of the release of the final receipt, was chargeable with notice of its character, it is unnecessary to determine, for from facts within his knowledge and from the records, and the notice imputed thereby, it is obvious that Dickson was put upon inquiry concerning the rights of Eliza, and that if the inquiry suggested had been made, it would readily have led to a discovery of the nature of the transactions between Tolon and Eliza. Dickson was purchasing land worth between $1,400 and $1,500, subject to a $500 mortgage, for $200. The power of attorney and the agricultural lease disclosed that the vendor of the deed to Tolon had, some eight days prior to making her conveyance, named her subsequent vendee as her attorney in fact; that in recognition of her title and continued

right, Tolon executed said lease both in his own right and as attorney in fact for Eliza. Such circumstances alone would naturally provoke the inquiry as to what right in the demised premises did Eliza then have. It could not be said that the tenants held possession other than in subserviency to the title of their lessors. Had due diligence been exercised in making inquiry, as to the true state of the title, it would have disclosed the circumstances under which the deed to Tolon was made. From an investigation it would have been learned without difficulty that the deed was made by the former ward to her erstwhile guardian, one week after his discharge, and while she was still a member of his family; that the consideration of $1,500 named in the deed was not paid, and that no other valid consideration passed between the parties. In short, it would have disclosed the entire unconscionable transaction, by means of which Eliza was deprived of the record title to her lands.

Our conclusions find strong support in the opinions of this court. In *Cooper v. Flesner et al.*, 24 Okla. 47, 103 Pac. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29, it was said that:

"The words 'actual notice' do not always mean in law what in metaphysical strictness they import. They more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts."

And further that:

"One who purchases land with knowledge of such facts as would put a prudent man upon inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith if he neglects to make such inquiry,

and is chargeable with the 'actual notice' he would have received."

This case was cited and followed in *Russell v. Gerlach*, 24 Okla. 556, 103 Pac. 604; *Creek Land & Imp. Co. v. Davis*, 28 Okla. 579, 115 Pac. 468; *Brooks v. Reynolds*, 37 Okla. 767, 132 Pac. 1091. In *Hatfield et al. v. Lotty*, 48 Okla. 173, 149 Pac. 1171, the rule is thus stated by Brewer, C.:

"He claims to have bought upon the strength of the record title, and without any actual knowledge of the idiocy of the original grantor; but it must be admitted that he is chargeable with all the notice that is brought to him by the record upon which he relies. If this record is such and contains matter that would put an ordinarily prudent purchaser in doubt of, and upon inquiry into, the want of capacity of his grantor, then the law will charge him with all the knowledge that inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him."

Quoting from the opinion of the Supreme Court in *Wood v. Carpenter*, 101 U. S. 141, 25 L. Ed. 807, the learned commissioner says:

"Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."

Notwithstanding the inquiry suggested by the public records respecting the particular lands about to be purchased by him, it does not appear that Mr. Dickson, though a lawyer of ripe experience, made any inquiry whatever concerning the nature of the title of Tolon, or the claim of Eliza.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded, with instructions to enter judgment for the plaintiff.

All the Justices concur.