## JONES v. BROWN.

No. 19095.  Opinion Filed Oct. 8, 1929.

Rehearing Denied Nov. 26, 1929.

J. Hugh Nolen and Kittie C. Sturdevant, for plaintiff in error.

Phillips & Duling and Baskin & Busey, for defendant in error.

BENNETT, C.  December 5, 1924, Vivian Brown, a minor, by Thomas Brown, her father and next friend, brought suit against Clyde Murphy, a minor, and his guardian, L. C. Murphy, in district court of Okfuskee county, Okla., for damages for seduction, and about a year thereafter she recovered a final judgment of $3,000.

Plaintiff was represented in this litigation by Crawford & Shaw, attorneys, to whom she assigned an undivided one-half interest in the judgment in payment of their fees.

March 16, 1927, plaintiff executed a paper writing conveying her remaining one-half interest in said judgment to one A. H. Jones. The validity of this latter assignment is the matter in contest here.  April 27th plaintiff filed a motion to vacate said assignment alleging that she had been induced by fraud to execute said assignment for an inadequate consideration. Upon hearing this motion, the court sustained same and vacated the assignment, and said Jones, assignee, plaintiff in error here, after an unsuccessful motion for new trial, appeals to this court.

The assignment, sought to be vacated, omitting caption, is as follows:

"Comes now Vivian Brown, in her own right, and by Thomas Brown, her father and next friend, for and in consideration of the sum of $1 and other good and valuable considerations, the receipt of which is hereby acknowledged, and hereby bargains, sells, sets over, and assigns to A. H. Jones, or assigns, all of her right, title and interest in and to the judgment rendered in this cause wherein she obtained judgment against the defendant, Clyde Murphy, in the sum of $3,500, said judgment having been reduced by remittitur, and now stands in the sum of $3,000 and costs.

"Dated this the 16th day of March, 1927.

"Vivian Brown.
"Thomas Brown.

"Father and Next Friend of Vivian Brown."

(Acknowledgment before J. J. Armstrong, Notary Public).

The motion to vacate sets out that her attorney, O. A. Shaw, and A. H. Jones approached plaintiff to buy her interest therein, and stated that said judgment was worthless; that plaintiff, reposing confidence in said Shaw, who then was acting as her attorney, and because of said statements, executed the assignment to A. H. Jones, who was present during negotiations; that the statements by said Shaw and Jones were knowingly false and fraudulent; that the judgment, to the knowledge of such attorney and Jones, was and is worth par, but its value was not known to plaintiff.

This being an equity proceeding, and it being the duty of the court, upon appeal, to weigh and consider the evidence, we will set out herein the substance of the evidence:

Plaintiff, Vivian Brown:  Is plaintiff and lives at Holdenville; 20 years of age; brought suit in district court of Okfuskee county and secured judgment of $3,000

against Clyde Murphy. Mr. O. A. Shaw was her attorney and was such on March 16, 1927. Witness identifies the assignment in question to A. H. Jones. Witness received for assignment $25 in money and $25 by check. There were present at the time Mr. Shaw, Mr. Armstrong, Mr. Jones, and witness. Asked to give the conversation between witness and Mr. Shaw and Mr. Jones at that time, the witness said:

"Well, Mr. Jones didn't have anything to say, but Mr. Shaw said he had decided to sell his part of the judgment to Mr. Jones, and he couldn't sell his part unless I was willing to sell mine, and I couldn't sell mine unless he did, and that $50 was all that the judgment was worth, and if I didn't take that much, I wouldn't get anything, because the judgment was not worth any more than $100, $50 for me and $50 for him. * * * Q. Did you believe the statement made by Mr. Shaw? A. Yes, sir, I had to; he was my attorney and I didn't know any other word to take but his. Q. You relied, did you, or did you not, on the statement he made? A. Yes, sir; I did."

Cross-examination: Witness knows nothing of any proposed settlement for $400 between Mr. Shaw, Mr. Crawford, and witness's father, with Clyde Murphy; never heard of it. Mr. Shaw never talked before that of buying witness's judgment. Her father was her agent, but she did not know he tried to sell the judgment. She knew that Clyde Murphy had 20 acres of land when she obtained judgment. Her father first talked to her alone about selling judgment. He did not much wish her to execute assignment, but he said to do whatever Mr. Shaw, her attorney, told her to do.

Witness's father lives near Wetumka, but he was at Holdenville the day the transfer was executed. Mr. Shaw said that he had brought Mr. Jones to buy the judgment; that $50 was all he could get for it; that the judgment was worthless, and that if we did not take that, we would not get anything.

"Q. They didn't tell you that the judgment was absolutely worthless? A. That is what he said. * * * Q. What did he (your father) tell you in the conversation that made you make the sale? A. He didn't say anything. * * * Q. They didn't insist on your selling the judgment? A. Yes, sir."

Tom Brown: Father of Vivian Brown; on March 16th O. A. Shaw and A. H. Jones came to witness's home in Hughes county, and Mr. Shaw said:

"'I can sell that judgment for $50; by God, I am up against it, and I need the money to pay my taxes, and I can't sell hers without selling mine, and I can't sell mine

without selling hers,' and I says, '$50 is nothing,' and he says, 'She may get some money in 15 or 20 years,' * * * and he said that the Murphy estate was in debt and owed for a bid car and the judgment was ahead of Vivian's, and if he would die now it wouldn't pay the judgment, and if she could get $50, she had better take it, * * * and I told him to go and talk to her, and he did and she says, 'I would just as soon Murphy would keep it,' and Mr. Shaw says, 'Mr. Jones will give you $100,' and I says, 'If there is nothing to it, he is throwing his money away,' and Mr. Shaw says, 'That is the way he makes his living; he does them kind of tricks;' * * * and he says, 'That is the way he makes his money;' * * * and I went down to see her, and she says, 'Papa, I don't want to sign that for $50,' and I says, 'Mr. Shaw is your whole soul, mouth-speaking, and you do what he tells you, and he has searched into it, and knows the Murphy outfit, and you had better take that than nothing;' * * * and I says, 'Are you going to sign it?' and she says, 'If that is all, I will sign it for the baby,' * * *"

Cross-examination: Witness is a farmer; was never in school a minute. In the field at work when Mr. Shaw and Mr. Jones came. Had never tried to sell the judgment to Mr. Shaw or to any one. Explaining, witness says:

"Mr. Shaw said after the judgment was rendered, 'I can get $400 for that judgment, the cash money, and what do you think about it?' and I says, 'It is nothing to me; I will see Vivian Brown,' and he says, 'You let me know when you come in the next time,' and I saw her, and she objected to it, and I didn't say anything more about it."

Witness knew that Clyde Murphy had some land, but did not know how much. Sold judgment because the lawyer said that was all there was to it. Mr. Jones said that he was throwing his money away. Mr. Shaw said that Mr. Jones was in the business of buying worthless judgments. When they arrived at Holdenville, Mr. Shaw asked witness to go and talk to the girl and explain it and see if she would not go to the courthouse and sign. Mr. Shaw said to Vivian, "I think we have done the best thing, because that judgment is no account; * * * and $50 to you and $50 to me * * * is all it is worth."

"Q. Why did you go from your home to Holdenville if you didn't want to sell it? A. Because Mr. Shaw insisted on it and he was her attorney, and I thought that was the right thing to do."

J. J. Armstrong: Lives at Holdenville; occupation, real estate; took acknowledgment of assignment as notary. Mr. Jones

and Mr. Shaw and driver came for witness and they drove out to Mr. Ramsey's, where plaintiff works. When they got out there, Vivian Brown did not do much talking. Mr. Shaw explained the matter of the assignment; told her that this was the assignment of the judgment; told her that she was getting $50 for it. She said it was all right. Before she signed it, Mr. Shaw said at. sometime or other this judgment might be worth good money, but he figured they were getting all it was worth now. Mr. Shaw did the talking. He said that $50 was a fair price for the judgment.

Cross-examination: After Mr. Shaw made the explanation, Vivian seemed ready to sign. Mr. Shaw said that he was selling his at the same time. Plaintiff rests.

A. H. Jones: Is a collector for the Dodge Garage. Mr. Shaw was their attorney. Witness was in Mr. Shaw's office quite a lot on business for the garage company. Had a case one day and won a judgment and was talking about it in his office, and Shaw, for the first time, said that this Brown judgment could be bought; that Brown had been asking him to sell the judgment. Later the subject came up again and witness, Shaw, and driver went to see Brown and other parties. Went to the colored man's house to buy the judgment. Mr. Shaw pointed out Brown's house. Brown either asked or witness offered $50; Brown seemed anxious to trade; insisted that we close the sale that day. We then went to Holdenville and saw the girl, who wanted to sell. We got notary public and had papers filled out and came back, then witness explained that if she were not satisfied, he did not want to fool with it. She said she knew all about it, and witness gave her $25 in money and a $25 check. and witness also gave Mr. Shaw a $50 check for his one-fourth interest and then we left.

"Q. You didn't know what the judgment was worth at the time you bought it? A. I didn't know a thing about it. I knew it was a $3,000 judgment on the face of it, but I heard Mr. Shaw say they offered to settle it at one time for $400."

Neither Shaw nor witness said to Vivian or her father that the judgment was worthless.

Cross-examination: Witness and Mr. Shaw went down to see about buying the judgment and other business. Witness and Shaw had other suits in Wetumka. Witness says that he does not know that they had other business at Wetumka; that they went to see the negro; says that they did not go altogether to see the negro; that one Barrow furnished the car, but that witness paid the car expense, and that one of the purposes in taking Mr. Shaw was to buy the judgment. Did not investigate land owned by Murphy, but heard some one say that the Murphy boy had an interest in the land. Employed Mr. Shaw to issue execution on the judgment about eight or ten days after purchasing judgment. Did not room with Shaw then, but has an office right near in the same building. Mr. Shaw told plaintiff that the judgment might bring some good money later on. Witness says he does not know whether he told counsel for plaintiff the first time he talked with him that Mr. Shaw did not talk with the plaintiff; does not remember, but says that he knows now exactly what Shaw said to her. Witness did not know that the judgment was a lien on the land at the time of the assignment, nor anything about the land.

Mr. Shaw said that he would prepare the assignment. A few days after taking the assignment witness told Mr. Shaw to take whatever steps were necessary to collect. Mr. Shaw told him what the appraisement was. Witness did not find a purchaser to buy the land; left that up to Mr. Shaw.

O. A. Shaw: Was one of attorneys in securing the judgment for Vivian Brown. After the judgment Vivian's father came to witness to find a purchaser for this judgment. Mr. Crawford owned one-fourth of it, witness a fourth of it, and Vivian Brown the balance. Tom said that they would take $50. He came later to find if I had sold it. About that time Mr. Jones was in witness's office a good deal. Witness told him about the Brown judgment, and that the father said they would take $50, and a day or two later Jones and Barrow asked witness to go with them down to see Brown. Saw him near his home, and witness told him that he had spoken to Mr. Jones about buying judgment. Witness took no part in conversation; Jones and Brown did the talking; Jones said he would give $50 for their interest, and it was agreed on. Brown said Vivian Brown would do whatever he said, so they drove over to Holdenville and saw her. Witness does not know what Tom Brown said to Vivian, but he said she was willing to sell. Witness and others went to town and prepared assignment. Witness said that Mr. Jones might get more money for it in the future, but witness thought it was a fair price. Witness owns none of the judgment now. Tom Brown was at witness's office twice after a settlement for $400 was agreed upon, but Murphy could not raise the money. Vivian was not there.

Cross-examination: Did not explain to

Vivian that witness was getting twice as much as she was, or that witness got the same sum for one-fourth interest that she received for one-half interest in the judgment. She, Vivian, knew what she signed. Did not explain why witness's interest was worth twice as much as hers. Did not explain why Mr. Crawford did not join in the assignment. Does not recall telling Jones that Murphy had an interest in the land, but witness knew that he claimed an interest. Did not know the extent of the claim. The judgment had been taken for two years and witness had made no effort to collect the judgment or to determine if it were collectible. Had had no execution issued, but did talk to Pat Murphy about paying, but he said he was short of money. Eight or ten days after the assignment to Jones, witness was employed by him to collect judgment. Witness examined the same guardianship files of Clyde Murphy as he had examined as attorney for Vivian Brown and found practically the same facts to exist. Witness gave the sheriff a description of the land to be sold under execution.

"Q. And then, how soon was it that you found some property and had an execution issued and sold it for $1,000? A. A few days after that. Q. Are you getting a fee from Mr. Jones? A. I am expecting a fee for it."

The one-fourth interest in the judgment was witness's fee for representing and completing the lawsuit and business for Vivian Brown. Another one-fourth was given to Attorney Crawford. Witness did not tell Vivian not to execute the assignment. Witness says the reason he demanded $50 from Jones before making the assignment to his interest was that he wanted the money, and since Jones had his check book out. Witness has had other business with Jones.

"Q. Have you sold other contingent judgments to him? A. Not that I recall. I don't remember it."

A. E. Barrow, for defendant: Remembers taking a trip with Jones and Shaw. Mr. Jones asked him to go with them and said better get Mr. Shaw, as he wanted to see a colored man and that Mr. Shaw knew where he lived. When they got down to Tom Brown's, Mr. Jones and Tom Brown dickered about the purchase of judgment. One or the other offered to give or take $50, and they then went on over to Holdenville to close the matter. Tom went with witness and the others to Holdenville. Jones did not talk with the colored woman until the notary went in with the assignment. They did not go to see anyone else on the trip except Brown.

Upon the foregoing and much other testimony of similar import, the court found that the assignment should be vacated. Was this error?

"The relation of attorney and client is one of the highest trust and confidence, requiring the attorney to observe the utmost good faith towards his client. The law regards the client as being under the influence and control of the attorney while the ordinary professional relation exists between them, and for that reason the conduct and acts of the latter are closely watched and scrutinized, especially where his clients are persons of inferior capacity and inexperienced in business; and if the transactions present even a suggestion of unfair dealing, the burden of proof rests with the attorney to show that it was fair, just, and equitable. In the absence of such proof, the court will treat it as constructively fraudulent. The rule is one of public policy, and applies not only to the attorney himself, but also to a clerk, in his office, who deals with a client in a matter with which he became acquainted as such clerk." Thornton on Attorneys at Law, vol. 1, pp. 272-3-4-5, par. 152, and numerous cases cited under notes from 1 to 16, inclusive.

Our own Supreme Court has approved this general rule in Ewing v. Ewing, 33 Okla. 414, 126 Pac. 811, in which many authorities are cited and discussed. In addition, the court therein approves another doctrine quoted from the case of Huxley v. Rice, 40 Mich. 73, and which is applicable here, as follows:

"The fraud of which Moore was guilty was in preventing the conveyance to himself, which would have inured to Monroe, and in obtaining it to his wife, so as to reap the benefit which belonged to his grantee. Mrs. Moore stands in her husband's shoes, and by accepting, with knowledge, is to be treated as a party to his fraud and profiting by it, or as a mere volunteer assisting him to perpetrate the fraud and to profit by it, and is hence to be held, as he could have been, a trustee, ex maleficio."

We must assume in the case at bar that the attorney for Vivian Brown, before instituting the suit against Murphy, made diligent inquiry as to whether or not the judgment, if recovered, would be collectible. Good faith would seem to require this. This assumption is strengthened by the fact that Tom Brown put up only $20 to start the suit, and that the remainder of the fee was to be contingent upon success, the attorneys taking half and the plaintiff the other half the proceeds. It seems the case was fought vigorously to a conclusion and the judgment for $3,000 in plaintiff's favor became final. The next important fact of which we shall take notice is that, in March,

1927, one A. H. Jones, perhaps a client, and, at any rate, a very close business associate of O. A. Shaw, plaintiff's attorney, became interested in this judgment. The inference is that he became interested through representations of Shaw and almost immediately thereafter Shaw, Jones, and a driver set out in an automobile from Okfuskee county over into Hughes county for the purpose of purchasing Vivian Brown's one-half interest in said judgment. They first went to the home of Tom Brown, plaintiff's father, to whom Shaw represented that the judgment was practically worthless and that something might be obtained from it within 15 or 20 years, but that he had discovered one Jones who was in the habit of throwing away his money who would give $50 for the interest of his daughter in the judgment. The father argued with a great deal of native logic that $50 was almost nothing as consideration for the judgment, and that he was getting too old to take care of a young man's child, and asked if there were no way to collect the money, but that Shaw insisted that it was all the claim was worth. The matter was then taken up with the plaintiff, who was unwilling to make the assignment, saying she would just as soon that the defendant should keep the money if she was not to get anything out of it, and thereupon Shaw represented that he was selling his interest for $50. He had not made the assignment, but Jones thereupon gave him a check for said sum. The notary public said that Shaw told the plaintiff that $50 was a fair price for her part of the judgment and finally her father told her that Mr. Shaw was her sole mouthpiece, and had looked into the matter, and knew the condition of defendant, and she had better take that rather than nothing, so that plaintiff executed the assignment and almost immediately thereafter, the purchaser Jones employed said Shaw to collect his judgment, and eight days after the execution of the assignment Shaw caused an execution to be issued, which was levied upon the land of the judgment debtor, which was thereupon appraised at $1,500, and later actually sold under execution for $1,000, but perhaps due to plaintiff's activity the sale was never confirmed.

There was evidence on the part of defendants that Shaw and Jones had other business matters which they intended to look after on their trip over in Hughes county; but the evidence of their witness, the driver, indicates that they stopped at no other places than Brown's and the place where plaintiff worked. There was evidence, too, to the effect that Mr. Shaw told

plaintiff's father that he (Shaw) could not sell his interest unless the plaintiff sold hers, neither could plaintiff sell hers unless Shaw sold his. Mr. Jones, as we find from the evidence, was present during these conversations, and apparently doing what he could, in a quiet way, to relieve plaintiff of a worthless judgment. The girl at that time says that Mr. Shaw was her attorney, and that she took his word and relied upon it; that she did not know upon whom to rely except her attorney; that her father told her to do what her lawyer advised. They even told her that the judgment was **absolutely worthless,** and in addition that the land was not worth any more than they were getting out of it; that was all that could be gotten. Most, but not all of the witnesses, said that Jones did not open his mouth, but since Jones carried Shaw with him, confessedly to buy this judgment and obviously to do all the talking, and, in fact, he did most of it, with the knowledge on Jones' part that Shaw was the attorney upon whose advice the plaintiff and her father would probably rely, we can see no difference between his position and attitude and that of the man who was doing the talking. This seems to have been part of a definite plan. It is also in evidence that the attorney used on these simple folk his own need for money as an argument for the sale. The impropriety of this should have been apparent to Jones, who appears to be a man of affairs.

It is difficult, of course, to prove fraud, for that is usually hidden in the breasts of those who contemplate it, but the concert of action, the confidential relations, the disparagement of plaintiff's judgment, coupled with the avidity to purchase same shown here, together with the alert and successful interest displayed by Shaw for his newfound client, follows so quickly the doleful story to the plaintiff and her father, that a fair inference would be that both the attorney and Jones must have known that this judgment was worth having. No other theory would justify the acceptance of employment by Shaw at the hands of Jones. It would have been unfair to both to have accepted good money in an effort to collect that which was without value.

In the case of Watts v. Jackson, 75 Okla. 123, at page 124, 182 Pac. 508, Judge Rainey, quoting from the case of Young v. Murphy, 120 Wis. 49, 97 N. W. 496, says:

"'If an attorney purchases his client's property concerning which his advice is sought, the transaction is always viewed with suspicion, and the attorney assumes the heavy burden of proving, not only that there was no overreaching of the client, but that

the client acted upon the fullest information and advice as to his rights. In other words, the attorney must prove uberrima fides, or the transaction will be set aside by a court of equity.'"

And Justice Sharp, in Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756, says:

"While equity does not deny the **possibility** of valid transactions between parties, where a fiduciary relationship exists, yet, because every such relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively his compliance with equitable requisites, and of thereby overcoming the presumption."

It is worthy of note in this case that this plaintiff seems to be a colored girl about 20 years old, of perhaps average intelligence. She was employed as a nurse at the time of this transaction. Her father appears to be a farmer, without learning, but of average intelligence for his race. From the evidence one would perhaps infer that the attorney was selling the same interest in the judgment as was the plaintiff, but, in fact, he purported to be selling only a one-fourth interest and his client was selling a one-half interest therein, and yet they were receiving $50 each. Common experience and observation inform us just how complete the confidence of an ordinary humble colored man is in his attorney. He, of course, knows nothing of courts, for he has no part in their operation. The dominant race has perhaps, for his own good, seen to it that such citizens who have had no experience in government shall have a minor part therein. This factor makes it imperative on those who do run the courts and the government to see that the members of this child race shall not be wronged in their tribunals of justice. That is about as little as they can do, and that they should be glad to do.

The brief for plaintiff in error makes some apology for bringing a case involving $50 to this court. The case in fact involves just $50 so far as Jones is concerned, but the plaintiff perhaps thought and had a right to think, when she discovered, a few days after the assignment was made, that assets had been found and a collection appeared probable, that the case involved a great deal more. To the average citizen, that quick discovery of assets and that new burst of energy to realize something after all the gloomy talk to the plaintiff, can be understood only in the light of the conclusion that all the facts were not fully disclosed to plaintiff.

A man who deals with an attorney deals with an edged tool. By training, by tradition, by experience, he is prepared to protect those who are defenseless and unable to protect themselves. It is an honorable profession. Lawyers handle without bond untold millions in money. They are entrusted with confidences not even known to the clergy. By business men everywhere their advice is taken without question and on the gravest matters. This high estate can only be preserved by requiring the members of the profession to see to it that they do nothing to destroy this confidence. There goes with this high privilege also the high duty of being circumspect, conscientious, and faithful.

From the evidence in this case, we think it can properly be deduced that this measure of faithfulness has not been observed toward a helpless, ignorant client, and we hold, therefore, that the judgment of the lower court is not against the clear weight of the evidence, but is in keeping with the weight of the same, and for that reason, the same is affirmed.

HERR, HALL, DIFFENDAFFER, and JEFFREY, Commissioners, concur.

By the Court: It is so ordered.