## MIDLAND SAVINGS & LOAN CO. v. CARPENTER et al.

No. 18245. Opinion Filed July 2, 1929.

Jno. D. Rogers, Brett & Brett, and Ledbetter & Brown, for plaintiff in error.

Brown, Brown & Williams, for defendant in error Mary J. Carpenter.

John H. Thompson, guardian ad litem, for defendants in error Pearl Jones, Otto Jones, and Roy Jones, minors.

BENNETT, C. Originally this was an action to quiet title to lots 6, 7, and 8, in block 461 in Ardmore, Okla., brought by A. Lyles against Mary J. Carpenter, nee Jones, Pearl Jones, Otto Jones, and Roy Jones, minors, and Midland Savings & Loan Company, a corporation.

Plaintiff alleged possession of said real estate, and that he acquired title through a contract of purchase in October, 1922, executed by C. L. Shinn, the agent of Mary J. Carpenter, nee Jones, whereby she agreed to convey the land to plaintiff in consideration of $2,200, and that later on November 1, 1922, she executed to plaintiff a warranty deed therefor. Plaintiff complained that his grantor owned only an undivided one-third interest in said premises and that the remainder belonged in equal parts to said infant defendants as heirs of T. J. Jones, deceased. That said real estate belonged to the estate of decedent, but that Mary J. Jones, as h's administratrix, took title thereto in her own name and subsequently as such administratrix, and as guardian for such minors treated and dealt with such property as trust property; that the said deed executed by Mary J. Carpenter, nee Jones, was,

except as to a one-third interest in said property, ineffective, and that plaintiff's title therefore was unmarketable.

Plaintiff states further that in order to carry out said purchase contract and improve the property he secured three first mortgage loans upon parts of lot 6. Each of said loans was for $1,500, and the proceeds used for improving the land mortgaged. Plaintiff prays judgment against his grantor and said minors quieting title to said land.

By her amended answer and cross-petition Mary J. Carpenter, nee Jones, denies the allegations of plaintiff's petition, alleges that she is owner in fee simple of said real estate, admits the contract of sale, but says that in order to carry same out she signed her deed and plaintiff signed his note and mortgage and all such papers were placed in American National Bank of Ardmore for delivery when plaintiff should investigate title and accept same and pay the $200 cash payment. That thereafter plaintiff and Midland Savings & Loan Company investigated the deed, note and mortgage, the title as it then stood, the escrow agreement, and ascertained that the purchase price had not been paid. With full knowledge of all said facts they, with no notice to this defendant, took from escrow the deed to plaintiff and placed same on record and negotiated the three loans for $1,500 each herein referred to with the loan company and secured the same by mortgages on the greater portion of lot 6 and caused the same to be placed of record. Said defendant alleges that she was the owner of the entire title to said lot at said time, that no part of her $2,000 mortgage had been paid. For her cross-petition she says that her mortgage is long past due and unpaid and that the loan company negotiated and placed of record its three mortgages with full knowledge, actual and constructive, of the existence of the first mortgage lien in favor of said Carpenter, and if said loan company has any lien, it is inferior to lien of said Mary J. Carpenter.

Wherefore she demands foreclosure of her purchase money mortgage and that same be adjudged superior to any rights of loan company.

Loan company alleged that it made said loans relying on an abstract showing title in plaintiff free and clear of all incumbrances, and that it was an incumbrancer in good faith for value and without notice of any claims of either Mary J. Carpenter, nee Jones, or of the minor children

aforesaid. The company also prays that if said minors have any interest in said realty the same be impressed with a lien for the money which went into the improvements on said real estate.

The answer and cross-petition of the minors sets up, first, a general denial, and adopts portions of the pleadings of others. For a cross-petition they allege that T. J. Jones, the husband of Mary J. and the father of these minors, died in Ardmore early in 1910 and his widow was immediately made his administratrix; that in 1906 T. L. Holland and wife, the then owners, mortgaged the lots herein to said T. J. Jones to secure a note for $2,100; that in June, 1910, there was a balance due on said mortgage of $1,790, and for which mortgagors gave new notes and mortgage on same property payable to Mary J. Jones, administratrix; that on April 15, 1913, the mortgagors executed to Mary J. Jones a warranty deed to said lots in satisfaction of note thereby secured, and that the original indebtedness belonged to T. J. Jones before his death, to his estate thereafter, and to his widow and these minors, his children, in the proportion of one-third to the former and two-ninths each to the latter, and that said deed to Mary J. was in trust for such heirs. Said conveyances are of record and copies are attached to the pleading. That plaintiff and loan company had actual notice of the minors' rights and that the records of county clerk's office and the probate record in said estate are notice to plaintiff and loan company of all rights of such minors, and that they are not innocent purchasers for value, etc. They ask that their interests be determined, and for an attorney fee. The issues between Mary J. Carpenter, nee Jones, and the Midland Savings & Loan Company, under their several mortgages, and their priorities, were determined first. At a later hearing the other issues were disposed of, but the evidence introduced in the former hearing was treated as a part of the record to be considered in the latter. For convenience we will refer to parties as follows: To Mary J. Carpenter, nee Jones, as "Carpenter"; to the minor children, Pearl, Otto and Roy Jones, as "the Joneses"; to the plaintiff, as "Lyles," and to the Midland Savings & Loan Company, as "loan company."

Although a jury was sworn, nevertheless the court, after demurrers and motions for directed verdict by the several parties, announced that since the verdict would be advisory only, he would decide the case, and thereupon directed the jury to find on the first branch of the case in favor of the defendant Carpenter and against the loan company, and declared Carpenter's mortgage a first lien and the several mortgages of loan company subject thereto. Later, upon hearing as to other issues a jury was waived and upon further evidence the court found that the minors were the owners of an undivided two-thirds interest in and to the property in controversy, together with all improvements thereon, free and clear of any lien, claim, or incumbrance of plaintiff, or of Carpenter, or of loan company; further, that the plaintiff, A. Lyles, was the owner of an undivided one-third interest in said property subject to a mortgage to the defendant Mary J. Carpenter, nee Jones, in the sum of $533.33, with interest thereon from the 27th of December, 1922, at 8 per cent., and $33.33 attorney's fee; that plaintiff, A. Lyles, is indebted to loan company in the aggregate sum of $4,500 with interest thereon, the same being the amount due on the three real estate mortgages described herein, each covering an undivided one-third interest in a certain 49 feet of the west 147 feet of lot 6, block 461, in Ardmore, and decrees of foreclosure were granted to such mortgagees.

The petition in error contains 13 assignments. They are presented in the brief and argument of the plaintiff in error under five subdivisions.

1. This subhead complains of the admission and rejection of evidence, and we are referred to the record, pages 112 and 113. The first was a blanket objection directed at no testimony offered at the time and is without merit. The second objection—

"Q. I wish you would look over that contract, will you examine the contents of that and see if that is the contract, is that the contract you made? A. That is it as I remember it; yes, sir. I suppose it is."

This was objected to as not responsive. This latter objection is entirely without merit and needs no discussion.

We are referred to page 116 of the record as showing incompetent evidence introduced. The question there was asked:

"Q. I will ask you if you went with him to the agent of the loan company at any time. To any person holding themselves out as an agent of the Midland Savings & Loan Company?"

This question is not even answered.

We are referred to pages 119-126, incompetent evidence introduced through witness Mason. We find no objection to the evidence of this witness on these pages. We are re-

ferred to objectionable testimony introduced at record pp. 153 to 155. We find no objections to testimony on either of these pages. While the objection, we think, is not well presented, loan company attempted to exclude evidence of the contract on the ground that Carpenter was relying upon her mortgage for $2,000 and if there were no delivery of the deed there could be no valid mortgage, but her position is, however, that the papers were put in the bank in escrow for her protection and that when the deed was wrongfully withdrawn and placed of record those with knowledge and responsible therefor took no advantage by such wrong, but took subject to her rights under the escrow agreement.

"A prospective lender of money on real estate mortgage, who is advised that the intending borrower is without title, but that a deed conveying the property to him is deposited in escrow, is put upon inquiry as to the terms of the escrow; and if he neglects to ascertain them, when means are within his reach, but accepts the statements of the depositary, and makes the loan, and the deed is delivered by the depositary in violation of the escrow agreement, he cannot claim to be an innocent purchaser, as against the rights of the vendor secured by such agreement, but takes his mortgage subject thereto.

"A vendor, whose deed, deposited in escrow, together with a mortgage back for purchase money, was delivered by the depositary in violation of the escrow agreement, and who has the right to assert the priority of his mortgage over another given by the purchaser, and first recorded, is not estopped to insist on such priority by accepting and recording his mortgage, nor by any subsequent acts which in no way prejudiced the rights of the other mortgagee." Balfour v. Hopkins, 93 Fed. 564.

The next error alleged is that the court admitted in evidence the contract of purchase over the loan company's objection based upon the ground that the evidence showed no knowledge of this contract by such company. Evidence showing such knowledge will be quoted and discussed under subdivision 2.

The following evidence on cross-examination of Lyles was offered:

"Q. Did any banker ever offer to take this property off your hands, any banker ever offer to pay Mrs. Carpenter in full and take a mortgage on all the property and place it of record as a second mortgage to the Midland mortgage as their security and let you hold the land?"

—to which Carpenter objected, and the witness was instructed to answer, and answered as follows:

"A. The banker offered to loan me the money to take up the mortgage; I don't know if they would take a second mortgage or an assignment of mortgage; I don't know what they intended to do.".

Upon motion by Carpenter's counsel the court struck this testimony. We are unable to see any prejudice to the defendant in striking this testimony, which was clearly incompetent.

2. Under this subdivision the defendant discusses together five alleged errors: (1) Error of the court in overruling the demurrer of the Midland Company to the evidence of the defendant Carpenter; (2) error of the court in overruling a motion of the Midland Company for a directed verdict against defendant Carpenter; (3) error in sustaining motion of defendant Carpenter for directed verdict, * * * the verdict is not supported by evidence, and is contrary to law; (4) error of the court in rendering judgment for defendant Carpenter and against loan company as contrary to evidence and contrary to law; and (5) error of court in not rendering judgment for the loan company upon the pleadings and evidence introduced in the trial of said cause.

We consider these together, as they involve primarily the question as to the sufficiency of evidence to support the judgment. In the trial of this case Carpenter assumed the burden of proof under the allegation that she was the owner of the lots in controversy, and that she, through her agent, contracted to sell the same to plaintiff for $200 cash and first mortgage on the lots for $2,000; that the deed, note, and mortgage were put in bank in escrow to be delivered upon examination and acceptance of title and payment of $200 by Lyles; that thereafter Lyles and the loan company, through its agent, with knowledge of the condition of the title and escrow agreement and of the fact that the purchase price had not been paid, took from bank the deed and caused same to be recorded. That they negotiated the loans from loan company and placed its mortgages of record so as to constitute, apparently, first liens upon the property covered by the mortgage which still lay in the bank. It is true that Lyles had no conversation with the bank at the time the papers were deposited there, but when notified of this disposition of them he made no dissent. Young Carpenter, the agent of Carpenter, testified as to leaving the papers in the bank and said there was a memoran-

dum made by the bank showing terms of delivery thereof. How did the papers get out of bank? There is not a hint that Mrs. Carpenter, or Shinn, her special agent, or her young kinsman, Arthur Carpenter, ever consented to or knew of such removal. The proof is uncontradicted that Wolverton and Shores, who practically officed together, conducted all the negotiations in making and closing such loan. The applications therefor were in the desk of Wolverton, were made out by and acknowledged before him. He did much, if not all, of the correspondence in respect thereto; kept the files and when he removed from the office took the file with him. He was in the office when matters concerning this loan were discussed. Wolverton received the commission and on two of the applications submitted to home office were indorsed the words "Fees $5.00 C. K. of Wolverton." On the third application were indorsed the words: "Fees $5.00 C. K. of Allbaugh." It is admitted that Allbaugh was agent for loan company. The significance of this indorsement is that it seems to put Wolverton in the same place and in the same capacity as the acknowledged agent. Lyles explained to Wolverton that he had not paid for the property and wished loan company to pass title before he accepted deed and paid for it.

A letter dated January 27, 1923, from agent Shores to loan company stated that Lyles had not taken title to the lots and would rely upon approval of title by loan company before paying for and taking title. Four days later a letter from loan company is mailed to agent Allbaugh saying that Lyles wished to get the houses completed before the loan was closed and forwarding abstract covering one of said lots which was to be examined and approved before Lyles would close his deal. February 1, 1923, a letter from loan company's president to Shores indicated the record showed good title to said lots in Carpenter, but suggested that Lyles should not rely entirely on opinion of loan company in accepting title.

The applications for the loans by Lyles represented that he had paid for the lots, but these letters clearly disclose such was not the case. They show too that he had not examined the title and was not going to take up the deed until the loan company passed on the title for him. As was their custom, the loan company, after accepting the loan applications, made the checks payable to Lyles and Shores, their agent, and mailed same to Shores directing him to see that all prior incumbrances were released

and indicating that they held him responsible for a personal investigation as to incumbrances and as to disbursements. The loan company asserts and often reiterates in its brief that there is no evidence that said company had knowledge of the purchase contract and bases much of its argument and many of its contentions on the correctness of such statement. At page 477 of the record in cross-examination of plaintiff Lyles by Judge Brett appears the following:

"Q. At the time you made the loan with the Midland Saving & Loan Company they had no notice of this contract, did they? A. I think Shores and Wolverton knew about the contract. I told them about it."

This direct evidence does not stand alone; the close association of Shores and Wolverton, the manner of handling the loan between them, the manner of correspondence, the keeping of the files, and the interchange of business favors, all point to knowledge by the loan company, and we must and do assume they had such knowledge. And since the delivery of the deed depended on the contract, they must have known that not a dime had been paid for this land—they must have known of the mortgage and the contract. With such knowledge can they in good faith claim to be innocent purchasers for value and without knowledge? We think not. The abstract and letters showed Lyles had no deed. Since it was the admitted duty of Shores to see that prior incumbrances were released, could he close his eyes to the purchase money mortgage?

"Where a deed is placed in escrow and is delivered to the grantee by the escrow holder without the performance of the conditions for delivery and without the knowledge or consent of the grantor, such deed is void.

"Where a grantee in such deed obtains possession thereof without the knowledge or consent of the grantor, and also obtains possession of the property without the knowledge or consent of the grantor, and transfers the property to a third person for value without notice, such purchaser obtains no title thereto as against the first grantor." Clevenger v. Moore, 126 Okla. 246, 259 Pac. 219.

This case is supported by Taylor v. Parkins, 74 Okla. 206, 178 Pac. 117; Wood et al. v. French, 39 Okla. 685, 136 Pac. 734. To the same effect see 21 C. J. 885. In the case of Balfour v. Parkinson, 84 Fed. 855, which was a case much like the one at bar, the court says:

"1. Where, in a contract for the sale of real estate, the parties agree that the pur-

chaser is to have time for the payment of the whole or any part of the purchase money, and that the vendor shall have a lien upon the property as security for a deferred payment, to be evidenced by a mortgage, and a mortgage is accordingly executed by the purchaser before the conveyance of title has been consummated, the conveyance of the title and the mortgage evidencing the vendor's lien, are in law one transaction, and the title passes from the vendor to the purchaser cum onere.

"2. Where a vendor's deed, and the vendee's purchase money mortgage and the notes secured thereby, are deposited in escrow with a third party, who delivers the deed to the vendee before the happening of the event upon which delivery was conditioned, the vendor may thereupon rely upon the delivery in escrow as sufficient legal delivery to make the liability of the vendee on his promissory notes absolute, and to render the mortgage effective.

"3. One who, at the time of loaning money on mortgage, has notice that the mortgagor has not made full payment for the property, and that the deed conveying the same to him is in escrow, is put upon inquiry, and charged with knowledge of facts which he might have acquired in the exercise of ordinary diligence and prudence.

"4. Notice of a prior unrecorded mortgage is sufficient to deprive a subsequent mortgagee of priority, even though he has already advanced part of the amount secured by the later mortgage, if, when he acquires notice, he is still in a position to rescind his agreement with the mortgagor, and resume possession of the sum already advanced, without suffering any loss."

In the case of Thomas v. Huddleston et al., 65 Okla. 177, 164 Pac. 106, the first and second paragraphs of the syllabus are as follows:

"1. The words 'actual notice' do not always mean in law what in metaphysical strictness they import. They more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts. One who purchases land with knowledge of such facts as would put a prudent man upon his inquiry, which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely to his vendor, is guilty of bad faith if he neglects to make such inquiry, and is chargeable with the 'actual notice' he would have received."

"2. Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."

In the case at bar we have evidence from which the court could find, and from which it properly did find, that the loan company had knowledge of the fact that there was an outstanding mortgage in favor of Carpenter, and that the purchase price of the land had not been paid.

3. Under the third subdivision it is urged that the court erred in overruling loan company's motion for judgment upon the pleadings as against the Jonses and error of the court in overruling motion of loan company to strike the amended answer and cross-complaint of the Joneses. The first answer of the Joneses adopted, in so far as the same might be applicable, part of the answer theretofore filed by their mother, but continuing they say:

"They admit they are the children and heirs of T. J. Jones, and Mary J. Carpenter, nee Jones; and that the estate was administered by their mother, but as to the disposition of their rights in said estate they know not, except as they have been informed, and therefore submit themselves to this court for protection of all their rights in the premises in controversy and to the proper judgment to be rendered in this cause."

Later the Joneses by permission of court, answered as hereinafter set out. The basis of the motion to strike is section 318, C. O. S. 1921, and cases in support thereof holding that no amendment of a pleading may be made which substantially changes the claim or defense previously relied on. This answer certainly placed the cause of these infants in the hands of the court for protection. In the case of Thompson et al. v. Rhyner et al., 86 Okla. 146, 206 Pac. 609, it is held:

"A defendant may set up as many inconsistent defenses in his answer as he thinks proper, and it is not a legal ground to strike an amended answer filed by leave of the court, that the amended answer is inconsistent with the defenses set up in the original answer filed in the case, or is a departure from the defenses set up in the original answer. * * *

"The rule of a pleading as to the result of an entire departure by an amended petition of the cause of action alleged in the original petition does not apply to answers."

It is the imperative duty of a court to guard the rights of minors in actions brought against them, and in case of a failure of a guardian ad litem to properly discharge his duty in that or any other respect, it then

becomes the duty of the court to protect such rights. Bolling v. Campbell, 36 Okla. 671, 128 Pac. 1091; see, also, Cudjo v. Harris, 119 Okla. 69, 248 Pac. 343; Tanner, Admx., v. Schultz, 97 Okla. 132, 223 Pac. 174. In the Cudjo v. Harris case the court, at page 71, says: "No right can be waived by or for an infant." To the same effect, Story, Eq. Pl., sec. 871; Wright v. Miller, 1 Sandf. Ch. 109; Mary White et al., Appts., v. William J. Miller, Exec., etc., 158 U. S. 128, 39 L. Ed. 921.

In the last named case the statute of limitations was allowed to be invoked by minor defendants where the guardian had omitted to plead same. See, also, 14 R. C. L. p. 291; Christina Gebhardt, Respt., v. U. S. Ry. Co. of St. Louis, Appt. (Mo.) 220 S. W. 677, 9 A. L. R. 1076.

4. The fourth contention, in brief, is that there is no evidence which would show a knowledge, either actual or constructive, on the part of loan company that the minors had an interest in the subject of the action.

The rule is that one who, in the purchase of land, relies upon the record title is chargeable with all notice brought to him by the records; and if the record discloses matters which would put a person of ordinary prudence upon inquiry as to the nature of the title of grantor or of the rights and equities of a former owner, then such person is charged with all the knowledge an inquiry prosecuted with reasonable diligence would have brought to him. Bynum v. Moore, 101 Okla. 128, 223 Pac. 687; Daniel v. Tolon, 53 Okla. 666, 157 Pac. 756; Allison v. Crummey, 64 Okla. 20, 166 Pac. 691.

The abstract upon which the loan company relied showed (1) that T. L. Holland was former owner of the lots in question; (2) that December 28, 1906, Thomas L. Holland and wife made a mortgage on said lots to T. J. Jones to secure a note for $2,100 due November 1, 1907; (3) that T. J. Jones died early in 1910, and Mary J. Jones, his wife, qualified as his administratrix in May, 1910; (4) that said mortgagors executed a mortgage on said lots to secure note of $1,790 to Mrs. Mary J. Jones, administratrix of T. J. Jones, deceased, dated June 16, 1910, due June 16, 1911; (5) that said mortgagors conveyed said lots by warranty deed dated April 15, 1913, to Mary J. Jones in consideration of $2,265; (6) Mary J. Carpenter, nee Jones, administratrix, on November 17, 1922, released mortgage made December 28, 1906, by Holland

and wife to T. J. Jones for $2,100; (7) Mary J. Jones, administratrix of the estate of T. J. Jones, deceased, on November 17, 1922, executed a release of the mortgage executed June 6, 1910, by T. L. Holland and Milda Holland to Mary J. Jones, administratrix of the estate of T. J. Jones, deceased; (8) Mary J. Carpenter, nee Jones, a single woman, executed a warranty deed dated November 1, 1922, recorded February 6, 1923, to A. Lyles, covering the same property. Would not a careful examiner of this abstract conclude from the very face of the papers only that the mortgage of T. J. Jones was paid by transfer of the mortgaged property to the wife of the mortgagee who also was the administratrix? It seems to us that this conclusion is almost inescapable. The decedent held a mortgage on this property; later a mortgage for only a slightly less amount covering the same property is taken from the mortgagors to the administratrix, and later the administratrix takes in her own name a deed to the real estate and the foregoing mortgages are not released until about 12 years after maturity, when both of same mortgages are released. Would not a careful examiner say that it was certainly a suspicious circumstance that the mortgagors should make a new mortgage to the administratrix and later convey the property to the administrator without having the mortgage released? Would he not conclude that any apparent dealing by the administratrix personally with the land which was the security to the estate was a suspicious circumstance? Would an examiner pass this title without making inquiry as to why the administratrix seemed to deal with this property personally and also as trustee? Would a release of these mortgages to the estate be accepted in the face of this record where such release was made almost a dozen years after maturity and long after the transfer of the title? Would not the investigator ask "Why this dealing with this property by this woman in a dual capacity? Why the release made so long after the transfer? If the administratrix personally bought the land, who paid the estate? It seems to us that the logical answer is that the land was taken to settle a debt and the circumstances indicated would provoke a further inquiry, which, under the evidence in this case, would have developed the fact that the administratrix took this land in trust for herself and the other heirs of the estate of her husband, so held it and so reported it to the court. In her administration report she indicated that she was compelled to take over the land because of the inability of the

mortgagors to pay, and later on in her guardianship proceeding for her children she indicated that they were the owners of an undivided two-thirds interest in this property.

In the case of Burton v. Compton, 50 Okla. 365, 150 Pac. 1080, there is discussed a case in which the guardian sold lands of of his ward under proceedings which were regular and the property passed into the hands of a third party. The purchaser at the guardian's sale had the same surname as the guardian and the court held that that circumstance was sufficient to put the purchaser upon inquiry to determine whether or not the guardian had, in fact, sold lands of his ward to his wife. The facts were that his wife purchased the land. Under our statute she is, of course, a separate person from her husband in her dealing. So jealous are our courts to see that trustees do not abuse their trust that they will protect no title where the record discloses a fact which would put a prudent man upon inquiry, if the purchaser accepts the title in spite of the warning fact.

We believe a reading of this abstract will not simply raise doubt in the mind of a careful investigator, but will force a conclusion that the property was taken over by administratrix for the benefit of the estate, and the slightest inquiry would have discovered the truth. It would have been found that the releases of these mortgages were executed eight or ten years after the discharge of the administratrix. That, in itself, when it applied to two mortgages, one payable to the estate of which she was administratrix, and the other to herself as administratrix, would tend to strengthen the apparent necessity for fuller investigation. If the estate paid the purchase money for these lands and the debts are all paid, we can conceive no reason why the lands should not go to those who have paid the consideration. Section 8463, C. O. S. 1921, is as follows:

"Trust presumed, when. When a transfer of real property is made to one person, and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

To the same effect, Grizzle, Ex'r, et al. v. Wright, 105 Okla. 294, 232 Pac. 947; Indian Land & Trust Co. v. Owen, 63 Okla. 127, 162 Pac. 818; Vaughn v. Vaughn, 65 Okla. 1, 162 Pac. 1131; and especially Montgomery v. Black (Ark.) 86 S. W. 1006.

Next our attention is called to the loan company's demand for a lien to be fixed upon the lots, the value of improvements, or, at least, upon the improvements, under the occupying claimant's act.

This is not the ordinary case of one erecting improvements upon premises upon the faith of apparent title. Here loan company undertook to pass upon the title for the benefit of its prospective borrower who had no title, and in examining the abstract for such purpose and for its own protection was fixed with notice that Carpenter held said title as trustee for certain minors and that she was proceeding to deal with same individually as if she were sole owner and needed no court order or authority. She could not have so dealt with same except with the assent or with the active participation of the loan company and the evidence is sufficient to find either or both to support the finding of the trial court.

With such knowledge as the law under this record will charge it, the loan company was guilty of not only culpable negligence but of a wrongful interference with and incumbering this property belonging to such minors—making it thus impossible for them, if it should become necessary, to sell or improve the property without incurring long and expensive litigation as illustrated here.

It is the business of courts of equity to correct mistakes, to relieve against fraud, oppression and wrongdoing, and not to encourage or offer a premium therefor. And where a loan company, under the management of skilled and intelligent financiers, runs a stop line, ignores a crossing signal, and, in its haste to loan money, tramples down a red flag of danger and as a consequence loses a little money, it should not be wondered at that when there is an outcry to a court of equity, the court should be found a little hard of hearing.

Finally we are called upon to decide as to the rights in this property of Pearl Jones, one of the minors, who, since her majority, and with knowledge of all the facts, chose to ratify and treat as proper the unauthorized disposition of her interest in said property by Carpenter, her mother. The authenticity of her written ratification and competency are not questioned.

Upon examination of the documents and record we hold that her ratification is sufficient to bind her. It is no part of the duty of a court of equity to give greater relief than a litigant of full age with full knowledge demands.

Upon examination of the whole record we

212

find that the judgment of the trial court should be affirmed with the modification that the undivided two-ninths interest in the property in controversy belonging to Pearl Jones is adjudged to have passed under deed of Mary J. Carpenter to A. Lyles and so much thereof as is covered thereby passed under plaintiff's mortgage to the loan company herein sought to be foreclosed.

TEEHEE, REID, LEACH, and FOSTER, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (4) 12 R. C. L. 1127; 4 R. C. L. Supp. p. 786. (5) 12 R. C. L. p. 1145; 2 R. C. L. Supp. p. 1560. See "Infants," 31 C. J. §61, p. 1017, n. 93. "Mortgages," 41 C. J. §470, p. 529, n. 41; §479, p. 537, n. 5; p. 538, n. 12; §562, p. 601, n. 64. "Trusts," 39 Cyc. p 386, n. 78.