CASPER NATIONAL BANK v. SWANSON, ET AL.
(No. 1623; Sept. 23, 1930; 291 Pac. 812)

114

For the appellant, there was a brief and an oral argument by *Robert N. Ogden, Jr.,* of Casper, Wyoming.

For the respondent there was a brief and an oral argument by *R. R. Rose,* of Casper, Wyoming.

116

RINER, Justice.

The plaintiff and respondent, Casper National Bank, a corporation, as guardian of the Estate of John M. Crawford, an insane person, hereinafter designated as the

"plaintiff," obtained a judgment in the District Court of Natrona County against the defendants Jessie Swanson, Fred Swanson, Nebraska Central Building and Loan Association, a corporation, Wyoming Trust Company, a corporation, and Leo A. Dunn. From that judgment the Nebraska Central Building and Loan Association alone has brought the cause here by direct appeal for review and will be subsequently mentioned herein as "appellant."

The facts leading up to this litigation are in brief as follows: In 1916 one John M. Crawford entered into a contract with J. M. Carey and Brother for the purchase of Lots 20 and 21 in Block 100 of the city of Casper, Wyoming, at the agreed price of $200 per lot. At that time the purchaser made a payment of $50 on each lot. Sometime during that year Jessie Swanson, Crawford's sister and the wife of Fred Swanson, about two or three weeks before he bought these lots, as she testified, loaned her brother the sum of $200, as "he wanted to invest something so he could get started." No note was given Mrs. Swanson—the only agreement on the part of Crawford being that he would "make it right; he would fix it up" by giving her the lots; that he would return the money or the lots. Further, as a witness on the trial, she stated that the lots were to be given her as security for the money, though there was no written agreement of any sort whatsoever in the matter and that her brother kept "putting it off"; also that on Lot 20 neither she nor her husband paid anything personally to J. M. Carey and Brother and that on Lot 21 she paid "one or two installments"—how much she did not remember.

In 1917 Crawford received a deed to Lot 20, recorded June 28, 1917. He remained in Casper until July, 1918, when he enlisted in the United States army. Prior to his departure he constructed a small frame two-room house on Lot 20 and lived there for some time, while the Swansons lived on Lot 21 in a covered wagon. Mrs. Swanson

claims to have loaned her brother some small additional amounts "to fix up" the property he bought, though she was unable to state just how much these were. At the time Crawford enlisted, Lot 20 was renting for $20 a month and thereafter the entire property was left in charge of his sister by Crawford, and she continued to collect and retain the rentals until at least April, 1923. They seem never to have been accounted for. Although Mrs. Swanson knew that her brother had received a deed to Lot 20, and that he was leaving for military service, she never demanded that he transfer these lots to her. Sometime after he had entered the Government service, a deed was issued to Crawford for Lot 21.

During the course of his military service, Crawford became incurably insane and the subject of care in various Government hospitals. Compensation for both total disability and on account of War Risk Insurance, was awarded him by the Government, and the several payments accruing on account of these items were receipted for by Fred Swanson, who, upon his wife's application to the District Court of Natrona County, Wyoming, was, on September 26, 1919, appointed and duly qualified as guardian of Crawford, as an insane ward.

Commencing in May, 1922, Swanson began to improve the two lots in question, and, according to his testimony, placed on Lot 20 a house costing approximately $6500, and on Lot 21 a house and garage costing about $13,000. Until April 4, 1923, when it was closed, he kept an account as guardian of Crawford in the National Bank of Commerce and the Wyoming National Bank of Casper, Wyoming. Thereafter his banking account was maintained in his own name and in it he commingled his own funds obtained from his business as truck driver, loans that he obtained from the banks, and Government payments to him as Crawford's guardian. The money to

finance the improvements, he drew from these several accounts as was necessary. It appears to be undisputed that at least $3,000 of the insane ward's funds were employed in the erection of the buildings placed on Lot 21. The record would perhaps justify the inference that more than this amount was used for that purpose, but in view of Swanson's methods of handling all funds which came into his hands, it is impossible to say how much this might be.

On February 9, 1923, as the improvements aforesaid were in the course of completion, Swanson, as guardian of Crawford, filed in the District Court of Natrona County, in the guardianship matter, his "Petition for Conveyance of Legal Title to Real Estate." In outline this petition sets out the fact of the guardianship; that Crawford was still confined as a Government patient for chronic and incurable mental disease; that Crawford had executed the contracts for the purchase of the lots aforesaid and had made a down payment on each of said lots of $50, which payments had been furnished by Jessie Swanson, his sister; that subsequent to Crawford's enlistment she had paid the purchase price of said lots and received a deed therefor running to Crawford; that she had placed improvements on said lots costing in excess of $13,000, pursuant to an agreement between Crawford and Jessie Swanson, whereby said premises "should be purchased in the name of said John M. Crawford, but in trust for said Jessie Swanson"; that it was necessary to secure additional funds through "loan and mortage upon said property" and to have the legal title of the property transferred to the true owner; that although the legal title to said premises stood in Crawford's name, the latter never had any estate therein, as Jessie Swanson paid the entire purchase price of the property aforesaid. The relief sought was the conveyance of the lots to Mrs. Swanson. This petition was positively sworn to by Fred Swanson, Jessie Swanson, and James Crawford, a brother of the insane ward, all of

whom were alleged to be the living next of kin of said ward. By an order dated February 7, 1923, filed on the 8th of that month with the petition described above, which recites a hearing and proofs taken with findings in accord with the allegations of the petition, Jessie Swanson was decreed to be the owner of said lots, and Fred Swanson, as guardian of Crawford, was directed to execute and deliver "proper and sufficient instrument of warranty deed conveying to said Jessie Swanson the legal title in fee" to said premises with all the improvements thereon.

No suit was or had been instituted by Jessie Swanson against the insane ward Crawford or his guardian to obtain an adjudication of her alleged rights in this property. Under the petition and order thereon, as aforesaid, her claims appear to have been adjudged ex parte without the presence of a disinterested person appointed to protect the interests of Crawford, incapable as he was of doing that for himself, without any notice to such a person and without any claim being made that the transfer of title was asked in order to meet the expenses and maintenance of the ward.

On the same day the petition and order directing conveyance to be made were filed in the District Court of Natrona County, Fred Swanson, as guardian of the person and estate of John M. Crawford, executed an alleged warranty deed to his wife Jessie Swanson for the two lots aforesaid. This instrument recited, among other things, that on February 7, 1923, upon the petition of the guardian Fred Swanson, the court, after hearing upon said petition and upon the filing of the approval and consent of all of the nearest of kin and persons interested in the estate of John M. Crawford, entered "judgment order" authorizing and directing the guardian to execute and deliver the deed, "reference being hereby made to said petition, approval, consent and the findings of fact, and the order thereon of said court." The instrument was

recorded in the office of the county clerk of Natrona County February 9, 1923.

Thereafter Jessie Swanson and Fred Swanson, on February 16, 1923, gave a mortgage to the Wyoming National Bank for the sum of $4200 on Lot 21. This mortgage seems to have been executed for the purpose of furnishing security for sundry personal unsecured loans previously made to Fred Swanson by the bank, which he had used to finance the erection of the building on this lot. On September 15, 1923, the Nicolaysen Lumber Company filed in the county clerk's office of Natrona County, Wyoming, its claim of lien upon the lot last mentioned and the two-story frame dwelling house situated thereon for materials furnished for its construction, the amount of the claim being, with accrued interest, $1644.47. The Swansons subsequently executed two mortgages upon Lot 21 in favor of the appellant, the first one being dated December 6, 1923, and for the sum of $5,000, and the second one, dated January 31, 1924, for the sum of $1,000. The money obtained through these mortgages was wanted, as Swanson testified, and apparently was used, to pay the obligations held by the Wyoming National Bank and the Nicolaysen Lumber Company already described, for on February 2, 1924, both the lien claim and the mortgage of February 16, 1923, were released on the county clerk's records.

Following these transactions and on June 2, 1924, the Swansons gave a mortgage to the defendant, Wyoming Trust Company, for the sum of $3500 upon Lot 20 aforesaid. This money was used to pay in part for improvements on that lot, costing, according to Fred Swanson, between $6,000 and $6500. The latter testified at first that $3,000 of Crawford's money went into these improvements, and finally, in response to questions from his counsel, said that he did not know whether any of Crawford's money went into the building on Lot 20. Later, being unable to

meet the interest payments due on this mortgage, the Swansons executed, on June 30, 1926, a warranty deed to the defendant Leo A. Dunn, one of the officers of the Wyoming Trust Company, transferring to him the premises covered by the mortgage given to the company last mentioned.

March 23, 1927, the Acting Regional Attorney of the United States Veterans Bureau filed charges in the District Court of Natrona County against Fred Swanson, as guardian of John M. Crawford, alleging serious mismanagement of the estate of his ward by Swanson and his failure to file an inventory thereof or annual reports, as required by law. A hearing was, on August 26, 1927, had upon these charges and upon an accounting made by Swanson, which resulted in an order removing Swanson as guardian, the appointment of the plaintiff in his stead, and a finding that there was due the estate of the insane ward from Swanson the sum of $12,880.94, which plaintiff was directed to collect from him. No review of this order appears to have been sought.

It further appears that due to falling property values, Lot 21, with its improvements, was, at the time of the trial of this suit, worth about $5500.

The present action was instituted January 21, 1928, by the plaintiff against the defendants above named to vacate and set aside the order of the District Court of February 7, 1923, directing Swanson to make the conveyance of Lots 20 and 21 to his wife Jessie Swanson, to cancel the deed given by him to her pursuant to that order, as well as all the mortgages subsequently given by the Swansons upon Lot 21 to appellant and the mortgage upon Lot 20 to the Wyoming Trust Company, together with the deed to Leo A. Dunn, and to obtain a judgment declaring John M. Crawford to be the owner of the real estate, free and clear of all claims on account of these various instruments. August 5, 1929, the District Court entered a judgment and

decree, in substance granting all the relief sought by plaintiff, it being found that the application of Swanson for leave to transfer the real property of his insane ward to Jessie Swanson and his deed to her were with the intent and for the purpose of defrauding John M. Crawford of said real estate; that neither of defendants has at any time been a bona fide claimant in possession of said real estate; that the court was without jurisdiction to enter the order of February 7, 1923, and that the several mortgages and deed held by the defendants as above described were null and void and should be cancelled. Appellant was given a judgment against the Swansons for the sum of $8,364.50. The court further found in its decree aforesaid, that Lot 20 had a rental value of $20 per month and was then worth about $2,000; that as the Wyoming Trust Company and Leo A. Dunn had offered to take a conveyance of the ward's interest in this lot and in return to pay plaintiff $1,000 and also to pay certain special improvement taxes in the sum of $750 due thereon and in the course of foreclosure upon bonds issued upon said lot, an equitable disposition of the matter required the acceptance of said offer and these last mentioned defendants were ordered to pay said amount to plaintiff, which, upon the court's approval, plaintiff elected to accept. From this decree, as already indicated, the Nebraska Central Building and Loan Association only has appealed.

The contention of plaintiff that the District Court of Natrona County was, under the circumstances shown, without jurisdiction to enter the order authorizing a transfer of the insane ward's title to Jessie Swanson and that the deed given her pursuant to that order was null and void, does not seem to be seriously disputed by appellant, and no case has been cited which would in the least degree appear to negative plaintiff's position on the point. The guardian of an insane person has no title to

the property of his ward, the title remaining in the ward. He is not the agent of his ward. He is the mere curator of his ward's property, and, so far as the law governing this case is concerned, might use it, under court direction, only for the support and expenses of the ward. Comp. Stat. of Wyo. 1920, Secs. 535, 536 and 537. At common law his powers were only such as were essential to the temporary preservation of the estate. The right to exercise any control of the property of the ward beyond this must be found in a statute of the state. 32 C. J. 692, and cases cited; 14 R. C. L. 576, Sec. 28.

No law of this jurisdiction, within our knowledge, authorizes the guardian of an insane ward to proceed as did Swanson in this matter. The proceeding was wholly an ex parte one, no suit having been instituted by Jessie Swanson to maintain her alleged claim to the property. No opportunity was given a disinterested representative of the ward—who under our code of civil procedure must represent the insane person in litigation against him (W. C. S. 1920, Sec. 5587)—to make a defense to such claim, which could very well have been done, as the testimony of the Swansons themselves in this record plainly shows. The vital point is, the insane ward was never made a party to a proceeding which took from him every foot of real estate he owned.

In Cooper v. Wallace, 55 N. J. Eq. 192, 36 Atl. 575, 577, the guardian of an insane ward sought by a bill to which the ward was not a party to obtain authority from a court of chancery to transfer real property to certain beneficiaries. The legal title to this property was in the lunatic, but it was represented to the court that the title was merely held in trust for the beneficiaries. Holding that it was powerless to enter such order under the circumstances, the court remarked that:

"A glance at the bill is sufficient to disclose that, while it asks for instructions in a general way, its most important purpose is to procure decrees by which the legal title of the lunatic to certain real estate may be transferred to other parties, in whom it is alleged an equitable right to such property resides. * * * It is to be kept in mind that to this bill the lunatic himself is not a party. No decree, therefore, in such a suit, purporting to transfer the lunatic's interest in any of this property, or which ordered the non compos to make such transfer, would possess the least force against the lunatic himself. The court must therefore content itself with the declaration of the scope of the guardian's power to deal with the lunatic's property in respect of the purposes sought to be accomplished by this bill."

After reviewing the English authorities on the subject and the few pertinent New Jersey statutes, the following language was used:

"It is perceived that by force of these statutes the guardian, by direction of the chancellor, may execute conveyances which will pass a title to the real estate of the lunatic, but it is also perceived that these conveyances are confined to an out and out sale of such lands for the purposes mentioned in the acts. In regard to the execution of any conveyance of the land held by a lunatic as mortgagee, to complete the mortgagor's right to redeem, or of a conveyance of such property held by a lunatic in trust for the purpose of executing the trust and putting the title in the beneficiaries, there is nothing in our legislation similar to the English statutes. There is no power whatever in the guardian to transfer the title of the real estate, which this bill claims equitably belongs to the Voles; nor is there power to execute conveyance to Koehler, to Noll, or to Fisher in case the money for the payment of which these properties are held as security is tendered. Neither title nor power resides in the guardian without statutory aid. Nor can such title or power be judicially conferred upon him. The legal title is in the lunatic, and can be divested only by a suit to which the lunatic is a party."

Our conclusion, accordingly, is that the order of the District Court of Natrona County of date February 7, 1923, purporting to authorize Fred Swanson to transfer to Jessie Swanson the real estate in question and the deed given her pursuant thereto, did not operate to divest John M. Crawford of his title to said property, and his ownership thereof remained unaffected thereby.

The contention is made for appellant that it occupies the status of a bona fide purchaser and should be protected as such. It is also said that "it was not shown at the trial that the warranty deed from Fred Swanson, guardian, was void, on the face thereof, or contained anything that could be construed as constructive notice." With these views we find ourselves unable to agree. Before proceeding further, it will be of service to examine what other appellate courts have said concerning similar contentions under facts approaching those before us.

In German Savings and Loan Society v. Tull, 136 Fed. (C. C. A. 9th Cir.) 1, it appeared that the heirs of a deceased wife had brought suit in the state court to recover a half-interest in certain real estate, as community property inherited from their mother. At the time she died, plaintiffs were minors, and their interests in the property were sold by their guardian, the father's brother, to their father, under an order of the probate court. The father, F. M. Tull, then mortgaged the entire property to the defendant in the suit for money borrowed for the purpose of placing improvements thereon and the defendant thereafter bought it in on foreclosure of the mortgage it held. By the final judgment of the state court, pursuant to a mandate from the Supreme Court of Washington, where the case had gone on review (Dormitzer v. German Savings and Loan Society, 23 Wash. 132, 62 Pac. 862), the guardian's deed and the mortgages to the defendant were held void and set aside as to the wife's half-interest, be-

cause fraudulent in law. Partition of the property was sought in the federal court. The loan society, the defendant in the partition suit, claimed the right to charge the interest of the minor heirs for one-half the improvements made upon the property with the money advanced by it. The Supreme Court of Washington, in its opinion, had held the loan society, the defendant mortgagee, not to be a purchaser in good faith. Declaring that adjudication binding in the Federal Court, Judge Ross used the following language:

"We must therefore accept it as an established fact that the present appellant does not occupy the position of a bona fide purchaser. Even if that were not so, the evidence in the present suit shows the same thing; for while the appellant relied and acted upon the advice of its attorney and agent, and was therefore innocent of any intended wrong, it knew the rights of the children, for they were matters of public record, of which it had not only constructive, but actual, notice. And as it, through its agents, knew of, and, indeed, was a party to, the proceedings through which F. M. Tull sought to divest the interests of the children and invest the same in himself, and as those proceedings constituted a fraud in law, as was adjudged by the Supreme Court of Washington and the Supreme Court of the United States, it is impossible to see how the appellant can, in any aspect of the case, be regarded in the light of an innocent purchaser for value of the children's interest. A mistake in regard to the legal effect of transactions, of which a party has notice, never makes of him a bona fide purchaser. In other words, as said in Bodkin v. Arnold, 48 W. Va. 108, 35 S. E. 980, 'plaintiff's belief, to be bona fide, must be founded on ignorance of fact, and not ignorance of law.' To the same effect is Milwaukee & Minnesota Ry. Co. v. Soutter, 13 Wall. 517, 20 L. Ed. 543. In Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891, it was expressly held that 'one having notice of facts rendering his title inferior to another, who, by mistake of law, regards his title as good, cannot claim for permanent improvements.' "

In Veeder v. McKinley-Lanning Loan & Trust Co., 61 Neb. 892, 86 N. W. 982, it was held that a subsequent purchaser or mortgagee of real estate sold by an administrator, is chargeable with notice of what is contained in the public records evidencing the chain of title through which the party claims; and where these records show that an administrator, in violation of law, was indirectly the purchaser of the property at such sale, and to whom the property was immediately transferred, such subsequent purchaser or mortgagee was not a good-faith grantee for value and without notice of the infirmity in the title held by his grantor.

Also, in Bank of Hartford v. Buffalow, 217 Ala. 583, 117 So. 183, it was decided that a grantee, including the mortgagee, has notice of what appears in the chain of title of his grantor or mortgagor, and that a grantee can pass to his mortgagee no greater estate than that defined in his deed.

To the same effect is the case of Union etc. Co. v. Simmons, 166 Ark. 285, 265 S. W. 953, 954, where this language was used:

"A vendor of land, who has parted with the legal title, has in equity a lien on the land for the unpaid purchase money, as against his vendee and subsequent purchasers with notice; and a subsequent purchaser will be affected with notice of all recitals in the title deeds of his vendor, whether recorded or not. If anything appears in such deeds sufficient to put a prudent man on inquiry, which if prosecuted with ordinary diligence would lead to actual notice of some right or title in conflict with that he is about to purchase, it is his duty to make the inquiry, and if he does not make it, he is guilty of bad faith, or negligence, and the law will charge him with the actual notice he would have received if he had made it."

In the case at bar there were received in evidence, without objection, certain pages of a real estate abstract of

the Natrona county records, dealing with Lots 20 and 21 aforesaid, from which it appears that the guardian's deed upon which alone appellant's mortgagors based their claim of title to these lots, specifically mentioned the antecedent proceedings in the guardianship matter and particularly recited that reference was "hereby made to said petition, approval, consent and the findings of fact and the order thereon of said court" in that matter. Appellant, in dealing with its mortgagors, necessarily had this deed before it, with the instrument's warning finger pointing directly at the steps taken in the guardianship proceeding undertaking to transfer title from Crawford to Mrs. Swanson. Appellant could not shut its eyes to what an examination of the guardianship proceedings would disclose. It was clearly chargeable with notice of all the defects in those proceedings pointed out above, and consequently cannot be regarded as a bona fide purchaser in its claim for rights under a title it knew, or should have known, was worthless.

It is also urged that as this is an equitable action for the cancellation of the several instruments concerning which plaintiff complains, that as the funds advanced by appellant upon the faith of the mortgages it took were used to pay off the Wyoming National Bank's mortgage and the Nicolaysen Lumber Company's claim of lien, and that as the funds and material derived from the creation of the obligations last mentioned by the Swansons had been used by them in placing improvements on the lands in question, the court should have required plaintiff to do equity by recognizing appellant's mortgages. But this view cannot be adopted without overlooking elements in this case which we are unable to disregard.

In the first place appellant did not put the improvements upon these lands. They were placed there by the Swansons. Even under the occupying claimants' statutes of this state (Art. 2 of Ch. 382, Secs. 6241-6251, W. C. S.

1920), the Swansons could not be regarded as entitled to aid, for in view of the record in this case and the findings of the trial court herein, they could hardly be said to be in possession "without fraud or collusion" on their part. In order that one may recover compensation for improvements made on another's land, even in a court of equity, the improvements must have been made in good faith. 14 R. C. L. 22, Sec. 11, 31 C. J. 319, and cases cited. It is difficult to see how the Swansons could meet this requirement. Fred Swanson, it was adjudged in the guardianship matter, improperly accounted for nearly $13,000 of his ward's funds and was held to be indebted to the latter in that amount. It is only because appellant inferentially claims subrogation to the rights of the parties making improvements upon the property in question, that it may urge the equities arising from enhancing the value of another's land thereby. But, assuming, for the sake of argument, that appellant is entitled to full subrogation rights—a matter not free from doubt—the Swansons, as we have seen, have no rights in that respect. If Fred Swanson had properly accounted for the funds coming into his hands as the guardian of Crawford, no case such as was presented to the trial court would have arisen.

It must not be forgotten either, that the present value of Lot 21, including its improvements, was, at the time of trial, only about $5500. This is the lot upon which appellant took its mortgages to the extent of $6,000. If they are allowed to stand, the property will obviously not meet them. Who should bear the loss—the insane ward, who was never a party to the proceedings which appropriated his property and who had nothing to do with the procurement of the various loans and the placing of the mortgages thereon, or the appellant, which, as we have seen, is not a purchaser in good faith and entirely ignored the danger signals contained in the deed through which it must claim any rights it has?

Among the many cases which elucidate the law which should, as we think, be regarded as applicable to the facts at bar concerning the point under consideration, may be mentioned the following:

In Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 424, 38 L. R. A. 694, the court, after a careful review of the authorities dealing with the right to recover for improvements placed on the land of another, said this:

"An ejected defendant, who made permanent improvements valuable to the estate, not when he merely believed his title good, but when there was reason to believe it good, may by filing his claims under Section 32, c. 90, and Section 1, c. 91, Code 1891, not only set off the value of such improvements against rents and profits, but recover any balance by which their value may exceed rents and profits; but if, when the improvements were made, there was not reason to believe the title good, he cannot even set them off against rents and profits; and notice either actual or constructive, of the defect of the improver's title and of the rights of others will preclude allowance for such improvements. He is precluded because he acts in bad faith or negligence, and cannot take away even the rents and profits of another by improvements the latter did not sanction, which by the common law became part of the land and belonged to the true owner, no matter how they came there, and which the statute allowed only to one legally without blame. The wrongdoer is not given the benefit of his wrong."

Justice Holmes of the United States Supreme Court, while chief justice of the Supreme Court of Massachusetts, wrote the opinion in Kerslake v. Cummings, 180 Mass. 65, 61 N. E. 760, where it was definitely held that where an assignee of a void tax title mortgaged the land to the defendant, the fact that he expended the money received thereunder in taxes and repairs could not avail the mortgagee in a suit by the owners to cancel the mortgage as a cloud on their title. So in German Savings and Loan Society v. Tull, supra, the court said:

"Authorities to the effect that a tenant in common who does not hold in good faith cannot recover for improvements put upon the property are too numerous to require citation. In Gillespie v. Moon, 2 Johns. Ch. 585, 7 Am. Dec. 559, Chancellor Kent said:

" 'Such an allowance would be confounding all moral distinctions, and be giving countenance and sanction to the most flagrant injustice.'

"And in the case of Milwaukee & Minnesota Ry. Co. v. Soutter, supra (13 Wall. 517, 20 L. Ed. 543), the Supreme Court of the United States, in speaking of a fraudulent purchaser of property, and asking if it was ever known that such a purchaser, deprived of its possession, could recover for his repairs or improvements or for incumbrances lifted by him whilst in possession, answered the question thus:

" 'If such a case can be found in the books, we have not been referred to it. Whatever a man does to benefit an estate under such circumstances he does in his own wrong. He cannot get relief by coming into a court of equity.'

"Moreover, the improvements put upon the property in question, one-half the cost of which the appellant seeks to charge against the Tull children, were put upon it not by the appellant, but by its mortgagor, F. M. Tull. The appellant was not then a tenant in common. Certainly F. M. Tull was a mala fide purchaser of the children's interest, for which reason, under the eminently just and thoroughly established doctrine above adverted to, he could not recover from them in a court of equity for any repairs or improvements, or for any incumbrances lifted by him whilst in possession. It is just as certain that the appellant could not acquire from F. M. Tull, either by conveyance or by subrogation, any other or greater rights than he himself possessed."

The Supreme Court of Illinois, in the recent case of Clark v. Leavitt, 335 Ill. 184, 166 N. E. 538, 539, considering in the light of the conveyance act in that state the question whether a probated will devising real estate, was constructive notice in respect to land lying within the county in which the will was probated, used the following language:

"It is also urged by appellants that they are entitled to reimbursement for improvements put on the land to the extent of the reasonable increase in the value of the land by reason of such improvements. This, again, depends on whether the probate of the will of Charles A. Clark in Piatt county was constructive notice to them at the time they took the deed to the premises, in which Mrs. Leavitt had only a life estate, since the rule recognized in the cases cited by appellants as to a right to reimbursement for improvements depends upon whether they in good faith, without notice, purchased the land. Wakefield v. Van Tassell, 218 Ill. 572, 75 N. E. 1058. If a purchaser in good faith and without notice of defects in his title makes improvements on land belonging to another, under the honest belief that he is the true owner, he is generally allowed for reasonable improvements which are of a permanent character and of benefit to the estate. Lagger v. Mutual Union Loan Ass'n, 146 Ill. 283, 33 N. E. 946; Cable v. Ellis, 120 Ill. 136, 11 N. E. 188; 3 Pomeroy's Eq. Jur. Sec. 1241. Whether he is a purchaser in good faith depends upon whether he had reason to suppose that his title was good. Where parties make improvements upon premises, having notice of the condition of the title, they have no claim upon a court of equity to be reimbursed for improvements. Wakefield v. Van Tassell, supra. * * * As full notice is given by the probate of a will of its effect on the real estate affected thereby in the county in which it is probated, we are of the opinion it was not the intention of the legislature that Section 33 should apply to wills probated, in the first instance, in the county in which the land is situated. It seems clear that the purchasers of Mrs. Leavitt's title had constructive notice that she owned but a life estate.

"Counsel for appellants earnestly argue that, even though this be true, appellants put improvements on the land in the honest belief that they owned it, and are therefore entitled to reimbursement for such improvements. It is the general rule that purchasers of real estate are chargeable with knowledge of the law, and with those things appearing in the record of the chain of title. It is the duty of a purchaser of land to examine the record, and he is chargeable with notice of whatever is shown by that record. Blake v. Blake, 260 Ill. 70, 102 N. E. 1007;

Buchanan v. International Bank, 78 Ill. 500; Brookfield v. Goodrich, 32 Ill. 363. The statutes providing for the descent of property by will confer on the county or probate court, which are courts of record, jurisdiction of real estate to be so conveyed. Appellants, on contemplating the purchase of the property in question in this case, were bound to examine the records, to ascertain in whom the title vested.''

Another recent case, that of Midland Savings and Loan Company v. Carpenter, (Okla.) 279 Pac. 310, 316, also deals with the subject we are considering. In that case a trustee of real estate for minor children, in violation of her trust, and under a claim that she was the sole owner, conveyed the property to another party, who obtained funds for improvements thereon from a loan company by giving it sundry mortgages on the property. Affirming the decree of the trial court and holding adversely to the loan company's contention that it should have a lien for the improvements made upon the premises in question, the court said:

''Next our attention is called to the loan company's demand for a lien to be fixed upon the lots, the value of improvements, or, at least, upon the improvements, under the occupying claimant's act.

''This is not the ordinary case of one erecting improvements upon premises upon the faith of apparent title. Here loan company undertook to pass upon the title for the benefit of its prospective borrower who had no title, and in examining the abstract for such purpose and for its own protection was fixed with notice that Carpenter held said title as trustee for certain minors, and that she was proceeding to deal with same individually as if she were sole owner and needed no court order or authority. She could not have so dealt with same except with the assent or with the active participation of the loan company and the evidence is sufficient to find either or both to support the finding of the trial court.

"With such knowledge as the law under this record will charge it, the loan company was guilty of not only culpable negligence but of a wrongful interference with and incumbering this property belonging to such minors—making it thus impossible for them, if it should become necessary, to sell or improve the property without incurring long and expensive litigation as illustrated here.

"It is the business of courts of equity to correct mistakes, to relieve against fraud, oppression, and wrongdoing, and not to encourage or offer a premium therefor. And where a loan company, under the management of skilled and intelligent financiers runs a stop line, ignores a crossing signal, and, in its haste to loan money, tramples down a red flag of danger and as a consequence loses a little money, it should not be wondered at that, when there is an outcry to a court of equity, the court should be found a little hard of hearing."

In harmony with these authorities and under the facts presented in this record, our conclusion must be that so far as the real property here involved is concerned, appellant is not entitled to relief.

Somewhat is said in the brief of appellant complaining of the form of the decree below touching the defendants, the Wyoming Trust Company and Leo A. Dunn, whereby they were permitted to pay $1,000 to plaintiff and certain tax improvement liens in return for the interest of the ward in Lot 20. But neither these defendants nor the plaintiff are here voicing their dissatisfaction with that part of the decree. Indeed, it was stated by counsel at the argument that that part of the decree was the result of a compromise settlement between the parties. As the settlement met with the approval of the court and nothing appears to show an abuse of discretion by the latter in sanctioning the arrangement, so far as the interests of the ward are concerned, we are unable to perceive how appellant is affected or aggrieved in the matter.

The foregoing discussion indicating sufficiently, we think, our views concerning the contentions advanced in

136

criticism of the judgment in this case, it results that the judgment and decree of the trial court should be affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.